**EXHIBIT M**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.      22-cv-00773 -WJM-SKC

<u>EMILY COHEN</u>,
Plaintiff,

v.

<u>ANDREW HARTMAN, in his official capacity as District Court Judge,</u>
<u>And pursuant to F.R.C.P. 25(d), his successor:</u>
<u>STEPHEN HOWARD, in his official capacity as District Court Judge;</u>
<u>ANNE KELLY, in her official capacity as Deputy District Attorney,</u>
<u>And pursuant to F.R.C.P. 25(d), her successors:</u>
<u>MICHELLE SUDANO, in her official capacity as Deputy District Attorney,</u>
<u>ADAM KENDALL, in his official capacity as Deputy District Attorney, and</u>
<u>MICHAEL DOUGHERTY, in his official capacity as Elected District Attorney;</u>
Defendants.

---

### "AMENDED COMPLAINT"
### FILED PURSUANT TO 10/23/23 ORDER

---

## A.    PLAINTIFF INFORMATION

<u>EMILY COHEN, 820 Maggard St., Iowa City, IA 52240</u>
(Name and complete mailing address)

<u>(319) 541-4577  emilycohenboulder@gmail.com</u>
(Telephone number and e-mail address)

## B.    DEFENDANTS INFORMATION

Defendant 1:    <u>ANDREW HARTMAN, 1777 Sixth Street, Boulder, CO 80302</u>
                (Name and complete mailing address)

                <u>(303) 441-3744  yeng.yang@judicial.state.co.us (clerk)</u>
                (Telephone number and e-mail address)

**EXHIBIT M**

SUCCESSOR DEFENDANTS, STEPHEN HOWARD AND DISMORE TUTTLE, AND
ALL FUTURE SUCCESSORS HAVE AND WILL HAVE THE SAME CONTACT
INFORMATION

Defendant 2:   ANNE KELLY, 1777 Sixth Street, Boulder, CO 80302
              (Name and complete mailing address)

              (303) 413-7071  ankelly@bouldercounty.org
              (Telephone number and e-mail address)

SUCCESSOR DEFENDANTS, ADAM KENDALL AND MICHAEL DOUGHERTY, AND
ALL FUTURE SUCCESSORS HAVE AND WILL HAVE THE SAME CONTACT
INFORMATION


**C.    JURISDICTION**

  x    Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the
Constitution,
      laws, or treaties of the United States)

      List the specific federal statute, treaty, and/or provision(s) of the United States
      Constitution that are at issue in this case.
      Title II of the Americans with Disabilities Act ("ADA") Title II, 42 U.S.C. §§ 12131-
      12134; Department of Justice ("DOJ") regulations implementing ADA Title II, 28
      C.F.R. pt. 35; remedies in 29 U.S.C. 794a; underlying U.S. Const. amend. I, IV-VI,
      XIV.


  x    Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual
or
      corporate citizens of different states and the amount in controversy exceeds
$75,000)

      Plaintiff is a citizen of the State of Iowa.

      Defendant 1 is an individual; Defendant 1 is a citizen of Colorado.

      Defendant 2 is an individual; Defendant 2 is a citizen of Colorado.


2

**EXHIBIT M**

**D.    STATEMENT OF CLAIM(S)**

**INTRODUCTION**

1.      Plaintiff Emily Cohen incorporates by reference and restates below the

Original Complaint she filed in this case more than eighteen months ago on March 28,

2022 (ECF No. 12), which was then reviewed by the Court, found to be meritorious, and

docketed.

2.      On May 26, 2023, the Court issued an order (ECF No. 7) ruling that

"after review [of the same March 28, 2022 Complaint, without any amendments] the court

has determined that this case does not appear to be appropriate for summary dismissal."

3.      On October 23, 2023, more than sixteen months after the Court had no

problem reading and reviewing that Complaint, this Court is now taking a "second bite at

the apple" by purporting to find in its most recent order that this case "may be" appropriate

for summary dismissal.  Plaintiff has objected and continues to object to this "second bite"-

taking as a misapplication of the law and facts, which constitute an abuse of discretion.

*See            Ingle            v.          Circuit          City*,            408           F.3d

592, 594 (9th Cir. 2005), et seq: "A screening order may not be ignored or disregarded.

To the contrary, the existence of a screening order which utilized the same legal standard

upon which a subsequent Motion to Dismiss or in the alternative Make a More Definite

Statement relies necessarily implicates the law of the case doctrine."  *See Thomas v.*

*Hickman*, 2008 WL 2233566, *2-3 (E.D. Cal. 2008).  This "gratuitous second bite at the

apple" is disallowed, and instead the law of the case doctrine must be applied to maintain

consistency.  *Id*.

3

**EXHIBIT M**

4.      On October 23, 2023, in its most recent order, the Court claims that

Plaintiff has "chosen" to proceed *pro se*, despite her repeated disclosures to the Court that

she does not have the financial ability to retain counsel.  There is no "choice."  On October

23, 2023, the Court in its most recent order goes on to instruct Plaintiff to pursue the

assistance of the Federal Pro Se Clinic; however, that is impossible.  The Court's website

http://www.cod.uscourts.gov links to "Federal Pro Se Clinic" at https://www.cobar.org/fpsc

and on this page the Colorado Federal Pro Se Assistance Project and Pro Se Clinic states

and has stated for more than one year now in the immediate center front of the page: **"We**

**are not taking applications at this time."**  When a user attempts to click on the "Click

Here to Get Started" link, there is no action on the website.  The link does not engage.

The site is not taking applications.  There is no way to "get started."  The Court's website

shows the instruction in this most recent order is impossible.

5.      In its October 23. 2023 order, the Court then states that in the

2014CR437 Boulder case, Plaintiff "failed to appear as instructed," but that is a

misapplication of the facts of that case, and the finding this Court makes on that

misapplication of the facts is an abuse of discretion.  As detailed in the brief provided to

this Court, Colorado Court of Appeals case 2022CA77 shows that Defendants acted

illegally, and that Defendant Hartman on several occasions in the record in 2014CR437

ordered that Plaintiff could appear via WebEx both before, during, and "even after the

pandemic is over."    Specifically, he ordered on November 1, 2021, that Plaintiff could

indeed appear via WebEx on November 2, 2021.  So, there was no failure to appear, and

no "failure to appear as instructed," because she was instructed to appear via WebEx, and

**EXHIBIT M**

she did.  This has all been cited and fully briefed in the Colorado Court of Appeals by attorney Suzan Almony, and cited and incorporated in this case at ECF No. 43.

6.    On October 23, 2023, in its most recent order, the Court also misstates the facts of the prior cases Plaintiff has filed in this Court.  The first case she filed, *Cohen v. Colorado*, was filed in 2021 prior to Defendants' choice to retaliate against her by once again locking her in solitary confinement pretrial, without bond, causing her to be unable to respond to the Recommendations because Defendants.  This was not a dismissal on the merits.  It was a summary dismissal and noted Plaintiff's lack of response.  This Court likely did not know at the time of that dismissal that Defendants were literally torturing Plaintiff in a jail cell at that time, and that that is why she was unable to respond, but this Court has known since the filing of her first Complaint in this case that Plaintiff did not "fail" to comply with any rule in that matter.  Emails between the Defendants in 2021 show that the actions Defendants took in that case in November 2021, after the statutory speedy trial period had already expired in that 2014CR437 case, were designed to interfere with Plaintiff's ability to access this Court, and it did.  This interference with Plaintiff's ability to access the judiciary and her Fifth and Fourteenth Amendment rights to due process are called "retaliation" in ADA Title II.  These are some of the very bases of this instant case, and the Complaint advised the Court of that.  Knowing and understanding all that already in May 2022, the Court drew this case.

7.    On October 23, 2023, in its most recent order, this Court also mischaracterizes the second case it cites that Plaintiff filed in this case, *Cohen v. Roth et al*.  This is a case that Plaintiff filed suing attorney Melissa Roth, her law partners Faisal Salahuddin and Adam Frank, and the series of law firms they opened and closed in a short

time while they represented her, for their legal malpractice and other intentional torts. Plaintiff is the plaintiff in that case.  She was the victim of those attorney-defendants' legal malpractice and other intentional torts, such as the assault and battery that Melissa Roth admits in email that she committed.   That *Cohen v. Roth* case is not "related to her professional disciplinary cases."   None of the cases in this Court are.   That case is a malpractice and tort claims case filed by Plaintiff against her former lawyers.  In September 2023, it was dismissed by the Judge whose order also misstated the facts of that case, and then misapplied the law, resulting in an abuse of discretion that is currently on appeal now.  In that case, Plaintiff moved for leave to amend the complaint, was granted leave to amend by the Magistrate the very same day she filed her motion, and then Plaintiff did amend and added the factual specificity requested by this Court.  The Judge, however, went on to then strike that amended complaint and completely disregard from her analysis all the factual allegations the authorized amended complaint set out, making an erroneous finding instead that there were no additional facts to consider, even though Plaintiff had supplied them to the Court pursuant to its order.   What's worse, after the initial Recommendations inquired of any additional causes of action and granted leave for Plaintiff to list them, which she then did, Plaintiff also at that time, a year before the Magistrate's dismissal, petitioned specifically for leave to amend to add these same facts, but she did not receive a response.   Instead, this Court reassigned her case to a new Magistrate, who then disregarded the law of the case in that matter as well, making a novel legal finding that the prior Magistrate had not made, that the defendants had never argued, and that is not supported by any precedent.  Among other issues, this was all error.  That case now continues in the 10th Circuit U.S. Court of Appeals.

**EXHIBIT M**

8.     The Court does not disclose in its most recent order that it also erred

in denying and striking Plaintiff's prior emergency motion and request for injunction in this

case, which she filed on August 22, 2023, at ECF No. 53 in this case, after Defendants'

successors continued to repeatedly deny her reasonable requests for accommodations,

including barring her trained cardiac-alert PTSD response Service Dog from the courtroom

after he had been present in court for over two years without issue.

9.     The next day, on August 23, 2023, this Court claimed in its denial order

at ECF No 55 in this case that Plaintiff acted in violation of the Rules and had not contacted

the Court prior to filing that emergency motion.  This is false.  Emails between Plaintiff,

Defendants, and the Court's Chambers show that Plaintiff indeed did contact the Court

and was instructed by the Court's clerk to file the emergency filings.

10.     It was and is also error for this Court to require Plaintiff to file this

amended complaint, even though she agreed that she would, and she attempted to show

good faith by expressing gratitude to the Court, which in its most recent order it ridiculed.

What's more, the contention that Defendants cannot frame any responsive pleading

because the complaint is allegedly so bad flies in the face of what Defendants actually

filed in their responsive pleadings, so this fails on its face.  Defendants filed many

responsive pleadings.  They responded at great length to the factual claims in the

complaint, picking at individual factual points and obfuscating so expertly that this Court in

its most recent order even misunderstood that there was no order that Plaintiff appear in

Boulder on November 2, 2021.

11.     It was and is error for the Court to condition Plaintiff's continued access

**EXHIBIT M**

to the federal judiciary in Colorado on her providing more facts now in an amended complaint; that is what discovery is intended to do.  *See Conley v. Gibson,* 355 U.S. 41, 47-48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  In this case, therefore, the Court cannot properly conclude that Plaintiff's nearly-two-year-old Complaint is "so vague or ambiguous" that Defendants "cannot reasonably be required to frame a responsive pleading."   Additional detail with respect to the ADA claim should be elicited through the discovery process, not through one-sided requirements that Plaintiff disclose and Defendants need not disclose.  *See Schmidt v. Shawnee Mission School Dist.,* No. Civ.A. 98-2377-GTV, 1998 WL 892662, at *1 (D.Kan. Dec.16, 1998) (denying motion for more definite statement;  "Courts expect parties to pursue discovery for details beyond those required by Rule 8 for pleadings.");  *Audiotext Communications Network, Inc. v. U.S. Telecom, Inc.,* Civ. A. No. 94-2395-GTV, 1995 WL 36543, at *5 (D.Kan. Jan.9, 1995) (denying motion for more definite statement;  "If more information is required, defendant has the full panoply of discovery methods available to it.").

12.     Nonetheless, now that Defendant Hartman has left the bench in the underlying case and the entire Boulder bench thereafter recused, and Defendant Kelly was reassigned by the Governor whose staff told Plaintiff in a series of emails and text messages that this move was "in light of" her admitted "overstep" in Plaintiff's underlying case, the successor Defendants continue to harm Plaintiff both in Colorado and in Iowa. It was error for this Court to continue to refuse to address their actions in Colorado with injunctive relief as ADA Title II provides it must.

13.     The harm to Plaintiff is still ongoing.  She still cannot access the courts

**EXHIBIT M**

in Colorado with her trained Service Dog who had previously been with Plaintiff in court

for over two years.    This is illegal, and this Court should have heard the petiton for

injunction at a hearing, and should still hear it now.  The Court has jurisdiction under Title

II to grant injunctive relief for this ongoing harm that will continue to prejudice Plaintiff as

she heads into a trial in the state courts without appointed counsel, and without any other

disability accommodations, suffering retaliation and discrimination as described in this

pleading again now.   Darren Cantor, the director of the Office of Alternate Defense

Counsel, sent Plaintiff invoices showing that each appointed attorney moved to withdraw

only after being paid the maximum amount payable on the case.  The Bergerud hearing

transcripts show each withdrawing lawyer telling the court that it was not their client's fault

they were withdrawing.

14.    Plaintiff still does not have the accommodations listed on the state

court's own website as "reasonable accommodations" for her named disabilities, as the

Complaint listed with particularity.

15.    The U.S. Supreme Court stated "all the rules require is 'a short and

plain statement of the claim' that will give the defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct.

99, 103, 2 L.Ed.2d 80, 85 (1957).  Recent cases confirming the notice pleading approach

include *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S.

163, 113 S. Ct. 1160, 122 L.Ed.2d 517 (1993) rejecting heightened pleading requirements

for certain civil rights actions) and *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 167

L.Ed.2d 1081 (2007) (rejecting heightened pleading requirements in civil rights cases).

16.    The Court also already ruled nearly one year ago on November 3, 2022,

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 10 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 10 of 93
**EXHIBIT M**

at <u>ECF No. 39</u> (unlinked, Text Entry Only): "On the recommendation or informal request of the Magistrate Judge or on the request of the parties by motion, the court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding."  To now claim the Court cannot so direct the parties is also error.

17.     Two judges in this Court now purport to be unfamiliar with Plaintiff,

but before she was a *pro se* in this Court, she appeared as a licensed attorney and protected her client here in a way that allowed this Court to set a very important precedent to protect immigrants.  In 2012, Emily Cohen was just an immigration attorney whose affidavit here asked His Honor to vacate a discovery order that would harm her client's family.  She was grateful that he did.  *See Reyes v. Snowcap Creamery, Inc.*, 898 F. Supp. 2d 1233 (D. Colo. 2012).  Judge Martinez's ruling in the *Reyes* case is still good law today.  In 2022, Judge Rodriguez, who threw Plaintiff out of this Court erroneously last month, cited *Reyes* in this Court to reiterate exactly what the very same Emily Cohen asked His Honor here to rule at that time: that a plaintiff's immigration status is irrelevant in an FLSA action**.**  See *Luo v. Wang*, 20-cv-02765-RMR-MEH.  Over the past decade, the holding in *Reyes* that the fledgling immigration attorney Emily Cohen implored Judge Martinez to make, and to this day thanks him for making, has been cited by federal courts in Colorado, Pennsylvania, Kentucky, Utah, Missouri, and D.C.  It has been discussed in law reviews at Harvard and Emory.  The facts in *Reyes* show who Emily Cohen was when no one was watching, right here in this Court.  That is still who she is, disability and all.

19.     It was and is error that this Court now in its "second bite" is claiming that it still needs to determine whether Plaintiff has stated a claim so it can decide whether to

**EXHIBIT M**

deny her access to the federal judiciary.  If she hadn't already stated a claim, the Court would have dismissed this case in the initial screen.  It didn't. Defendants should answer the Original Complaint.

20.    Magistrate Gallagher had no trouble at all reading what Plaintiff wrote. Unlike the most recent order in this Court, the first order did not insult Plaintiff or ridicule her disability and her gender with sexist language like "hysterical."   The Court remains bound by the first ruling and should follow its example, instead of filing public orders calling a disabled *pro se* Plaintiff who lives with PTSD "theatrical" and "dramatic."  Defendants should answer the Original Complaint.  They had no difficulty filing motions to dismiss it, and lying to the Court in those motions.

21.    Plaintiff has already stated the "temporal nature" of the claims.  Again, as explained in the Opening Brief in 22CA773, Defendants failed to accommodate Plaintiff's disability from 2014 to 2022, after which their successors continued and escalated this process.  Defendants should answer the Original Complaint.

**FACTS**

22. Plaintiff Emily Cohen is an attorney who lives with a disability. She has been denied disability accommodations by the Defendants and retaliated against by them on the basis of her disability as she has attempted to access the state and federal judicial systems, first as a licensed attorney and then as a criminal defendant in the State of Colorado. She is filing this Complaint *pro se* at this time because Defendants' actions have left her unemployed and indigent.

**EXHIBIT M**

23.     In June 2021, Ms. Cohen first petitioned this Court *pro se* in case number 21-cv- 01782-LTB-GPG. At that time, she requested an injunction from this Court, hoping to stop the discrimination against her in the state district court by these same Defendants and their colleagues. In December 2021, that case was dismissed without prejudice because she could not reply, or "in the alternative" possibly pursuant the *Rooker-Feldman* Doctrine, failing to specify that the ADA is its own independent cause of action, and that case and this case are not "appeals by state court losers."  Ms. Cohen is not a "state court loser."

24.     At the suggestion of this Court in 2021, Ms. Cohen at that time sought and obtained legal assistance from the terrifically helpful Colorado Federal *Pro Se* Clinic to file those claims.  That Clinic is now no longer taking new cases.

25.      On December 6, 2021, Defendants coerced Ms. Cohen – who was unmedicated, in jail and without counsel – to sign a purported plea agreement, without criminal defense counsel, in the Speedy-expired "retrial" of Colorado state district court case number 2014CR437.

26.     Appellate criminal defense counsel has recently been appointed to appeal that state district court conviction.

27.     The state court of appeals has accepted the state court appeal and assigned it Colorado Court of Appeals case number 2022CA77.

28.     This is the second time the Colorado Court of Appeals will review Defendants' denials of Ms. Cohen's Constitutional rights in the state district court case.

**EXHIBIT M**

In case number 2015CA0982, it unanimously reversed and condemned Defendants' prosecutorial misconduct.

29.     In that case, the state appellate court ruled that Ms. Cohen had not been convicted of the crime theft, but rather of the "crime" of having disclosed her disability to the state supreme court and being met in response with summary judgment disciplinary proceedings.

30.     Ms. Cohen is not requesting this federal Court interfere with the current state court appeal. In this Court, she is only seeking compensatory damages for Defendants' past ADA Title II violations, and an injunction to order Defendants to stop violating Title II and to follow Title II.

31.     In 2021, Ms. Cohen was physically unable to respond to this Court's Recommendation prior to its dismissal without prejudice; Ms. Cohen was not in contempt of this Court or acting in bad faith.

32.     At that time, the Defendants had ordered Ms. Cohen to be locked in jail in Iowa without access to PACER, without the ability to contact this Court from the out-of-state jail phone, and without counsel, during the period of time in which Defendants knew that this Court would be ruling on pending curative motions in Ms. Cohen's 2021 *pro se* injunction request against them.

33.     On November 2, 2021, the Defendants named in this Complaint, knowing they had been named in the 2021 ADA complaint, knowing this Court would then be soon

**EXHIBIT M**

to rule on the initial stages of those allegations against them, illegally and without any factual basis had Ms. Cohen arrested, allegedly and pretextually for "failure to appear" at a state court hearing on that day.

34.     The record in that state court hearing on November 2, 2021, shows that Ms. Cohen did in fact appear at that hearing.

35.     Ms. Cohen appeared at that hearing via WebEx, as Defendant Hartman had previously authorized her to do at virtually every appearance in the retrial in the years the case had been pending even before the Covid pandemic, and certainly well in advance of having received any documentation that Ms. Cohen had tested positive for Covid-19.

36.     Ms. Cohen had also previously submitted requests to appear by WebEx as a reasonable accommodation for disability, which had been objected to by Defendant Kelly and then summarily denied by Defendant Hartman.

37.     While Defendant Hartman did "allow" WebEx appearances, the record shows that WebEx access was not granted as an accommodation for disability. He ruled that all of Ms. Cohen's requests for accommodations were denied.

38.     When jurors consider the evidence of how Defendants responded with either a denial or retaliation, or both, every time Ms. Cohen disclosed her disability or requested ADA-mandated disability accommodations, they can look closely at what Defendants did on November 2, 2021.

**EXHIBIT M**

39.     On that day, the parties conducted an entire pretrial readiness and motions hearing in the state district court case, complete with rulings from the bench by Defendant Hartman.

40.     As the parties ended the hearing, Defendant Kelly asked Defendant Hartman to revoke Ms. Cohen's personal recognizance bond in the state court retrial charges, which at that point had been pending for over seven years due to the Defendants' errors.

41.     At that time, Defendant Kelly purported to introduce hearsay emails from a customer service representative adjacent to Ms. Cohen's medical provider's office to allege discrepancies in documentation that Ms. Cohen had sent to the district court, then urging Defendant Hartman to retroactively rule that Ms. Cohen had not appeared at the hearing that had just ended, though the record shows she had in fact appeared, argued motions, declared ready for trial, and heard rulings and adjournment.

25. Defendant Hartman then responded to Defendant Kelly by removing Ms. Cohen from the WebEx call, first by video and then three times by phone when Ms. Cohen tried to reconnect.

42.     . While actively blocking and repeatedly hanging up on Ms. Cohen, whose right to criminal defense counsel Defendant Hartman had denied on multiple occasions, Defendant Hartman and Defendant Kelly worked *ex parte* with law enforcement in both Colorado and Iowa to issue a warrant to arrest her on a "no bond" extradition hold on November 2, 2021.

**EXHIBIT M**

43.    Defendants had Ms. Cohen held in solitary confinement from that day until the evening of December 7, 2021, without her prescribed medications, without PACER access, without access to her mail, and without any other means to access to contact this Court.

44.    During that time, on November 16, 2021, this Court filed its Recommendation in the 2021 case requesting that Ms. Cohen clarify the *Rooker-Feldman* concerns in the 2021 case within fourteen days of that date. Ms. Cohen's response was due on November 30, 2021.

45.    On the morning of December 7, 2021, this Court issued a dismissal without prejudice of the 2021 case, citing Ms. Cohen's failure to respond to that Recommendation. This Court didn't know that Defendants had ordered Ms. Cohen to be held in solitary confinement in jail for the entire time the Recommendation had been pending.

46.    This Court also didn't know that Defendants had objected to her release on any bond at all during the time the Recommendation was pending, or that Defendants had defrauded the bond hearing judge in an attempt to keep Ms. Cohen held in custody.

47.    Defendants kept Ms. Cohen locked in solitary confinement for more than 24 hours after the state district court granted Ms. Cohen another personal recognizance bond release, waiting to release her until they received notice via PACER that this Court had issued its dismissal of her 2021 petition for an injunction to stop their then-ongoing ADA Title II violations.

48.    In 2021, Ms. Cohen sought an injunction, hoping to stop the retaliation and discrimination that was preventing her access to the courts. Since her access to the courts

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 17 of 93
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 17 of 93
**EXHIBIT M**

is no longer at issue now that the case in which she was denied counsel is on appeal in the state court, Ms. Cohen cannot seek the same types relief from this Court that she sought in 2021.

49.     There are new facts to plead in this Complaint that hadn't yet occurred when Ms. Cohen filed the 2021 lawsuit. *See Taxpayers for Animas-La Plata Referendum v. Animas-La Plata Water Conservancy Dist.*, 739 F.2d 1472, 1479 (10th Cir.1984) ("By definition, claims for past damages cannot be moot.")

50.     While her 2021 petition for an injunction was pending, and with years of access to medical records giving them detailed knowledge of her disability, Defendants abused their official capacities, acting as Judge and District Attorney, commanding law enforcement to ensure Ms. Cohen would be unmedicated, unrepresented, and paraded through airports, courthouses, lobbies, parking lots, and other public places in chains, as well as trapped in multiple jail cells in solitary confinement for five continuous weeks, instead of able to continue to argue the ADA complaints she filed against them in this Court in 2021.

51.     At this point, the damages caused by Defendants are done. Those damages cannot be mitigated or stopped. An injunction can't undo them. Ms. Cohen can only seek compensatory damages for them at this time.

52.     Defendants knowingly and intentionally, and without any factual basis, exceeded their both their subject matter jurisdiction as well as their personal jurisdiction to illegally order Ms. Cohen's arrest in Iowa, to lock her in solitary confinement in both Iowa and Colorado, denying her disability accommodations – including her request in Iowa to sign the very same plea agreement that she was forced several weeks later to

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 18 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 18 of 93
**EXHIBIT M**

sign in Colorado –, and to order her extradition across the country in shackles without medication, food, or water, in order to deprive her of access to both state and federal courts, including this Court, for five continuous weeks.

53.     Defendants summarily denied Ms. Cohen's requests for reasonable accommodations without even reviewing them, though they were required to review them by federal law, state law, and their own internal procedures.

54.     It will also be instructive for jurors, as they hear evidence of disability discrimination and retaliation on the basis of disability, that when Defendants summarily denied Ms. Cohen's requests for accommodations, Defendants knew that the accommodations she had requested in order to access the state courts were unequivocally "reasonable accommodations," because the accommodations she requested are explicitly stated in writing on Defendants' own websites as "examples of reasonable accommodations" for the stated disabilities which Defendants knew their own medical experts had all affirmed to Ms. Cohen, all listed and printed in Defendants' own published ADA compliance manuals and online guidance, as cited below in the Counts in this Complaint.

55.     Ms. Cohen's claims for the types of damages authorized by ADA Title II for Defendants' discrimination and retaliation against her on the basis of her disability must be raised in this Court because they cannot be raised in any other proceeding, such as in any state post- conviction criminal court proceedings or in a state tort suit. *Davoll v. Webb*, 194 F.3d 1116, 1129 (10th Cir. 1999). In July 2021, Ms. Cohen raised these Title II claims in the state district court and Defendant Hartman dismissed them.

56.     Ms. Cohen's claims in this Complaint are brought pursuant to ADA Title II and the Equal Protection Clause, and the discrimination in this case is based on disability.

57.     **No Exhaustion Requirement.**   Congress chose not to require the exhaustion of state or administrative remedies prior to the issuance of federal judicial relief under ADA Title II. *See, e.g.,* 28 C.F.R. Part 35 App. A, Subpart F (citing legislative history).

58.     The latest amendments to ADA Title II regulations, effective 3/15/2011, clarify that administrative exhaustion is not required prior to filing a federal lawsuit seeking compensatory damages for past violations. *See* 28 C.F.R. §§ 35.171(a)(2), 35.172, and 35.190(e), as amended, 75 Fed. Reg. 56164, 56184 56228–56229 (Sept. 15, 2010).

59.     Even so, in 2020 and 2021, Ms. Cohen took all procedural and administrative steps to request reasonable disability accommodations from Defendants as she tried to access the courts in the state court retrial proceedings.

60.     Ms. Cohen requested accommodations for disability in the state court proceedings in open court, both by speaking herself and through counsel Jonathan Willett during the two years he represented her. She followed Defendants' instructions to request accommodations, filling out their online form at https://www.courts.state.co.us/Administration/HR/ADA/Request.cfm, contacting their named Boulder ADA Coordinator Erika Skufca, contacting the Colorado State Court Administrator Steven Vasconcellos and his staff, contacting the Colorado Commission on Judicial Discipline, and contacting the Colorado Office of Attorney Regulation Counsel.

**EXHIBIT M**

61.      No one responded to the form Ms. Cohen filled out online. Immediately upon
submitting the form, she received an auto-reply email saying to expect a response soon,
but she never received any other communication.

62.      The Boulder ADA Coordinator replied to Ms. Cohen's email denying all
accommodations summarily.   Now, in 2023, the Judge (Judge Stephen Howard) is the
one denying accommodations, not the ADA Coordinator, which exceeds his judicial
function.   Additionally, Judge Howard is announcing the accommodation requests and
rulingin on them in open court, which also violates Title II and its confidentiality
requirements.

63.      The Colorado State Court Administrator's Office replied via email telling Ms.
Cohen to contact Defendants directly.

64.      The Colorado Commission on Judicial Discipline responded by sending Ms.
Cohen a letter in the mail denying her accommodations for disability.

65.      The Colorado Office of Attorney Regulation Counsel stated by phone that
they were, as previously stated, "adversaries" to Ms. Cohen and "not in a position to help"
her.

66.      Ms. Cohen files this suit now after years of being summarily denied
accommodations by Defendants and their colleagues when she followed their instructions
and took all steps they required to request accommodations for her disability, and they
denied her without consideration anyway.   This court adds insult to injury, calling her
"hysterical" and "dramatic," and complaining how long her pleadings are, instead of taking
its federally-funded time to actually read them and actually realize how horrific the
damages here are.

67.     The U.S. Supreme Court reiterated that ADA Title II does not require filing a complaint with a federal agency, or receipt of any permission before filing suit. *See Camenisch v. University of Texas*, 451 U.S. 390 (1981) (no exhaustion required prior to filing federal lawsuit).

68.     The U.S. Court of Appeals for the Tenth Circuit has agreed that exhaustion of administrative remedies is not required prior to filing in this Court under ADA Title II. *See Padilla ex rel. Padilla v. Sch. Dist. No. 1*, 233 F.3d 1268, 1274 (10th Cir. 2000) (no exhaustion requirement where plaintiffs sought damages solely to redress injuries due to past ADA violations and made no request for injunction or remedy of current situation).

69.     **No Notice Requirement.**  A private right of action has been authorized for violations of ADA Title II, and compensatory damages may be awarded. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992).

70. In Colorado, state law claims are subject to the Colorado Governmental Immunities Act ("CGIA"). *See* Colo. Rev. Stat. § 24-10-101 et seq. ("A public employee is immune from liability on tort claims arising out of an act or omission of the employee during the performance of his or her duties and within the scope of his or her employment, unless the act or omission causing such injury was willful and wanton.")

71. In 2015, Ridley, McGreevy & Winocur, P.C., as counsel for Ms. Cohen at that time, served these Defendants and their colleagues with GCIA notices by certified mail, in anticipation of state law tort and other claims which may become justiciable when the state suit ends. The claims in this Complaint, however, are statutory and Constitutional federal law claims, not state law claims.

21

**EXHIBIT M**

72. State pre-suit notice requirements do not apply to ADA Title II claims filed in federal court. *See* 28 C.F.R. at 35.172(d).

73. A state has no immunity from ADA Title II claims in cases implicating fundamental rights, such as Ms. Cohen's right of access to the courts. *Tennessee v. Lane*, 541 U.S. 509 (2004).

74. A state has no immunity from ADA Title II claims based on conduct that is also unconstitutional in addition to violating the ADA, such as Defendants' complete denial of Ms. Cohen's right to counsel at multiple critical stages of the state suit, and their other unconstitutional conduct described in this Complaint. *See U.S. v. Georgia*, 546 U.S. 151, 158–159 (2006).

75. When federal courts are called upon to interpret applicability of state law to federal laws and statutes, the federal court "must look to the rulings of the highest state court." *Johnson v. Riddle*, 305 F.3d 1107 (10th Cir. 2002).

76. In Colorado state courts, the Colorado Anti-Discrimination Act ("CADA") is "substantially equivalent to the ADA." *See* Dep't of Regulatory Agencies, 3 Code Colo. Regs. 708-91:60.1(A). CADA should be interpreted consistently with the ADA. *Tesmer v. Colo. High Sch. Activities Ass'n*, 140 P.3d 249, 253 (Colo. App. 2006).

77. The Colorado Supreme Court is clear that CADA claims cannot lie in tort. *See Denver Health and Hosp. Auth. v. Houchin*, 477 P. 3d 149 (Colo. Sup. Ct. 2020); *Elder v. Williams*, 477 P.3d 694 (Colo. Sup. Ct. 2020).

78. Claims against governmental entities seeking compensatory and equitable relief under CADA "do not and could not lie in tort and therefore are not barred by the

**EXHIBIT M**

CGIA." *Castle Rock v. Gonzales*, 545 U.S. 748, 125 S. Ct. 2796 (2005); *Denver Health*, 477 P.3d at 153.

79. **No Basis for *Rooker-Feldman.*** As this Court correctly stated in its 2021 Recommendation, if the source of the injury in a plaintiff's complaint in the federal district court is a state court decision, then the Rooker- Feldman doctrine would prevent this Court from asserting jurisdiction. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); See *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-284 (2005). However, that is not what this is.

80. The *Rooker-Feldman* doctrine stands for the principle that only the U.S. Supreme Court has appellate jurisdiction over state court judgments. See 28 U.S.C. § 1257. Since *Exxon*, the U.S. Supreme Court has warned that the federal district courts have at times extended *Rooker-Feldman* far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress's conferral of federal court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S.C. § 1738. *Lance v. Dennis*, 546 U.S. 459, 463 (2006) (quoting *Exxon*, 544 U.S. at 283). Since *Feldman*, the U.S. Supreme Court itself has never applied *Rooker-Feldman* to dismiss an action for want of jurisdiction. *Exxon*, 544 U.S. at 287.

81. In *Exxon*, the U.S. Supreme Court explained the narrow and limited application of the *Rooker-Feldman* doctrine as follows: "The *Rooker-Feldman* doctrine is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 24 of
Case 3:23-cv-00073-SMR-WPK     Document 31-13     Filed 12/29/23     Page 24 of 93
**EXHIBIT M**

rejection of those judgments." *Exxon*, 544 U.S. at 284.  In the wake of *Exxon*, the federal circuits have distinguished between: (1) plaintiffs who bring an impermissible attack on state court judgment-situations in which *Rooker-Feldman* applies, and (2) plaintiffs who assert independent claims before the district court-situations in which *Rooker-Feldman* does not apply. *See Parker v. Winter & State of New Mexico*, No. 15-2088 (10th Cir. Apr. 12, 2016) (relying on *Lawrence v. Blackwell*, 430 F. 3d 368 (6th Cir. 2005)).

82.     In *Guttman v. Khalsa*, an ADA Title II suit by a physician alleging that he had been denied disability accommodations, had been discriminated against on the basis of disability, and had been retaliated against on the basis of disability by government employees in a judicial proceeding concerning his work as a medical doctor, the U.S. Court of Appeals for the Tenth Circuit found that the *Rooker-Feldman* doctrine did not apply to the facts before the federal district court in *Guttman*.

83.     Like Dr. Guttman, Ms. Cohen is both an ADA Title II Plaintiff in this federal Court as well as a Defendant-Appellant in state court proceedings that were accepted for appeal by a state appellate court and therefore "not final state court decisions." *See Id*. As in *Guttman*, in this case *Rooker-Feldman* can't apply, because the state court proceedings are not final, and because Title II is an independent cause of action.

84.     The *Rooker-Feldman* doctrine cannot apply to the claims in this Complaint because it applies only to suits filed after state proceedings are final. *See Id*. at 1032; *See also DA Osguthorpe Family Partnership v. ASC UTAH*, 705 F.3d 1223 (10th Cir. 2013) (ruling that when a "state court appeal remains unresolved, on that basis alone we may conclude that the state court proceedings have not yet ended").  **See also *Behr v. Campbell*, 8 F.4th 1206 (11th Cir. 2021), which was a *pro se* case in which the 11th**

24

**EXHIBIT M**

**Circuit has made it quite clear that Rooker-Feldman is a narrow doctrine that will permit many challenges to the actions of state courts with respect to, in our case, actions violating a state court's ADA Title II obligations.**

85.     The Tenth Circuit in Guttman endorsed the First Circuit's analysis of this same issue, finding that "the First Circuit helpfully explained the situations where a judgment would be considered final for *Rooker-Feldman* purposes: (1) 'when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved;' (2) 'if the state action has reached a point where neither party seeks further action;' or (3) 'if the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions (whether great or small) remain to be litigated.' *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410 F.3d 17, 24 (1st Cir. 2005)." *Guttman*, 446 F.3d at 1032.

86.     The Tenth Circuit in Guttman found that "in this case, Guttman filed his federal suit while his petition for certiorari to the New Mexico Supreme Court was pending. His state suit was not final. As such, the *Rooker-Feldman* doctrine *does not* bar his federal suit and the district court does have subject matter jurisdiction to hear the case." *Id*.

87.     Like Dr. Guttman, Ms. Cohen has petitioned review of the ultimate decision of a state court in a state suit. Dr. Guttman petitioned the New Mexico Supreme Court. Ms. Cohen petitioned and was accepted for direct appeal as Case Number 2022CA77 in the Colorado Court of Appeals, which has already unanimously reversed the ultimate decision of Defendant Hartman once in Ms. Cohen's same state suit. *Id.*; *See People v. Cohen*, 440 P. 3d 1256 (2019); *See United States v. Smalls*, 605 F.3d 765, 768 n. 2 (10th Cir.2010) ("we may take judicial notice of public records, including state court filings").

25

**EXHIBIT M**

Like the state suit in which Dr. Guttman suffered ADA Title II discrimination and retaliation, Ms. Cohen's state suit is also not final at the time she is filing this Complaint. *See Guttman*, 446 F.3d at 1033.

88.     The Court of Appeals for the Tenth Circuit ruled that because Dr. Guttman's state suit was not final at the time he filed his federal complaint, the federal district court "does have subject matter jurisdiction to hear this case." *Id*. at 1032.

78. As in *Guttman*, the *Rooker-Feldman* doctrine cannot bar Ms. Cohen's federal ADA Title II suit for compensatory damages based on Defendants' discrimination and retaliation against her on the basis of her disability in their handling of the state suit, because the state suit is not final. *Id.*  As in *Guttman*, the federal district court – this Court – has subject matter jurisdiction to hear the claims in this Complaint. *Id*.

89.     **No Basis for Abstention.**   As the U.S. Supreme Court explained in *Colorado River*, the doctrine of abstention, under which a federal district court may decline to exercise or postpone the exercise of its jurisdiction, is "an extraordinary and narrow exception to the duty of a district court to adjudicate a controversy properly before it." *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813 (1976) (quoting *Cty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-189 (1959)).

90.     The U.S. Court of Appeals for the Tenth Circuit recently ruled that "the focus of the *Colorado River* doctrine is on 'efficiency and economy' and 'the avoidance of duplicative litigation.'" *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, No. 18-4013 (10th Cir. Jan. 6, 2022); *Id*.

91.     The U.S. Supreme Court in *Colorado River* "declined to prescribe a hard and fast rule" for application of the doctrine, "but instead described [four] factors relevant

26

**EXHIBIT M**

to the decision." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15

(1983). Those four factors were:

(1) whether the state or federal court first assumed jurisdiction over the same res;

(2)        the        inconvenience        of        the        federal        forum;

(3) the desirability of avoiding piecemeal litigation; and

(4) the order in which jurisdiction was obtained by the concurrent

forums.

*Colorado River*, 424 U.S. at 818.

> 92.    After its ruling in *Colorado River*, the U.S. Supreme Court identified three

more factors that may be relevant and may be given varying weight "from case to case,

depending on the particular setting of the case":

(5) the vexatious or reactive nature of either the federal or the state action; 12

(6) whether federal or state law provides the rule of decision; and

(7) the adequacy of the state court action to protect the federal plaintiff's rights. *Moses H.*

*Cone*, 460 U.S. at 16-17 n.20, 23, 26-27.

> 93.    The res is not the same in Ms. Cohen's state court proceedings and this

federal court suit. The res in the state court proceedings is, while working as a private

non-government lawyer from 2011 to 2014, whether Ms. Cohen committed the crime of

theft as defined by a Colorado state statute. The res in these federal court proceedings

is whether, while acting in their official capacities as district court judge and a deputy

district attorney and most specifically from 2020 to 2022, Defendants discriminated

against Ms. Cohen on the basis of her disability in violation of federal laws, namely ADA

Title II and the U.S. Constitution.

**EXHIBIT M**

94.     Defendants themselves have stated on the record that the res of this federal case, which is Ms. Cohen's disability and Defendants' discrimination and retaliation toward her based on it, was "irrelevant" to the res of the state court proceedings.

95.     The forum of the state court proceedings is the Colorado Court of Appeals in Denver, Colorado. The forum of this federal action is the U.S. District Court in Denver, Colorado. The two fora are equally convenient.

96.     Most urgently, there is no "parallel litigation in a state court" as defined by *Colorado River*, because the matters in the state court proceedings and in this federal Complaint are not parallel. *Id*. That is, the state court proceedings are a criminal prosecution. The state court proceedings allege the crime of theft. The state court proceedings do not allege violations of ADA Title II or anything else against these Defendants. The state court proceedings allege a state crime against Ms. Cohen based on conduct described in affidavits dated in the decade prior to this federal case, alleged by former clients of Ms. Cohen's, many of whom no longer live in Colorado, and some of whom are now dead, for reasons completely unrelated to Ms. Cohen. Moreover, ADA Title II is not even a possible defense to the allegations available to Ms. Cohen in those proceedings.

97.     The Colorado Court of Appeals is not an adequate forum to "protect the federal plaintiff's rights" at issue in the federal suit, because it cannot take any action at all based on ADA Title II. It only has jurisdiction to review the state district court record in the state retrial proceedings, and the most it can do for Ms. Cohen is to vacate the conviction if it finds reversible errors, which it already did once.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 29 of
93
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 29 of 93
**EXHIBIT M**

98.     Ms. Cohen has been advised by counsel that Defendants' violations of ADA Title II cannot be considered by the state court of appeals in the state court proceedings.

99.     Ms. Cohen was advised by counsel that violations of ADA Title II are not a basis on which she can request or receive appellate relief or post-conviction relief in the state courts.

100.    Moreover, the Colorado Court of Appeals cannot protect Ms. Cohen's right to have accessed the state courts with reasonable accommodations for her disability as was guaranteed to her by ADA Title II.

101.    Neither can the Colorado Court of Appeals undo Defendants' retaliation against Ms. Cohen on the basis of her disability and on the basis of her having pursued her federal rights under ADA Title II.

102.    The Colorado Court of Appeals cannot award compensatory damages or any other damages to Ms. Cohen either, whereas ADA Title II can.

103.    The "nature" of Ms. Cohen's federal case is not "vexatious or reactive," but rather is being filed a decade after the events in the state case, and for the exact reason that Congress said it needed to establish federal civil rights by writing the ADA: that "*state laws are inadequate* to address the pervasive problems of discrimination that people with disabilities are facing." S. REP. NO. 101-116 at 6 (1989).

104.    Congress wrote that purpose into the statute itself, citing that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

**EXHIBIT M**

105.    The U.S. Court of Appeals for the Tenth Circuit has ruled that abstention is inapplicable in cases such as Ms. Cohen's current claims, where the federal claim being brought is entirely separate from the state court proceedings, and where the federal case does not bring any state claims but instead brings only federal claims under the U.S. Constitution or any other federal statute that is unique to federal jurisdiction. *See J.B. ex Rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999).

106.    When a federal court has jurisdiction to hear claims, the court may be obliged to abstain if a federal-court judgment on the claim would interfere with an ongoing state proceeding implicating important state interests. *DL v. Unified School Dist. No. 497*, 392 F.3d 1223 (10th Cir. 2004). The most common example of this, which is described as *Younger* abstention, is a federal suit to enjoin a pending state criminal proceeding. *Id*. at 1228; *See Younger*; *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir.1999) (applying Younger).

107.    The U.S. Supreme Court clarified that "*Younger* exemplifies one class of cases in which federal-court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Again, the matters in Ms. Cohen's state court proceedings and in this federal Complaint are not parallel. *Id*.

108.    Ms. Cohen is not asking this Court to enjoin the state proceedings. She is asking this Court to order the state court to follow the ADA, and to stop violating the ADA.

109.    When she filed a complaint in this Court in 2021, Ms. Cohen also was not seeking at that time for this Court to enjoin or otherwise stop the state court proceedings. At that time, she only wanted an injunction as to the conduct that was violating ADA Title

II.  In 2021, Ms. Cohen asked this Court to order these and other Defendants to stop violating ADA Title II during those proceedings. Instead, they had her locked in jail for five weeks until that 2021 federal suit was dismissed without prejudice after this Court couldn't hear from her.  On December 4, 2023, they'll do that again.  Instead of directing them to follow the law, Judge Martinez has chosen to use his incredible power to ridicule and laugh at Ms. Cohen, calling her "hysterical" and "theatrical" and other sexist and ableist slurs in its most recent orders.  Judges Crews and Gallgher, however, have taken Ms. Cohen very seriously and found her pleadings worth docketing.

110.   Ms. Cohen did not and does not request that this Court enjoin the state court proceedings.

111.   The U.S. Supreme Court rules that *Younger* abstention is inappropriate where, as is the case for Ms. Cohen, a federal plaintiff cannot pursue her federal contentions in the ongoing state proceeding. See *DL*, 392 F.3d at 1230; *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435-37, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). *See Lebbos v. Judges of Superior Court*, 883 F.2d 810, 815 (9th Cir.1989) (no abstention where federal contentions are not raisable as state court defenses).

112.   In *Younger*, the U.S. Supreme Court ruled that "a federal court should not enjoin a pending state criminal proceeding unless an injunction is necessary to prevent great and immediate irreparable injury." *Younger*, 401 U.S. at 43-45; *J.B. ex rel. Hart*, 186 F.3d at 1291.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 32 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 32 of 93
**EXHIBIT M**

113.   Ms. Cohen is not asking this federal Court to enjoin the pending state criminal proceeding, because the "great and immediate irreparable injury" that the *Younger* court warned of has already happened to her.

114.   The actions that Defendants took in violation of ADA Title II in the state proceeding had nothing to do with the substance of that proceeding. The only relation between this federal suit and the state court proceedings is that at the times when Defendants denied Ms. Cohen access to the courts, which violated ADA Title II, they were both working as procedural administrators on behalf of "the People" in that state court proceeding.

115.   Defendants' actions in the state court proceeding caused Ms. Cohen to be repeatedly denied accommodations for disability, denied prescribed medications for long periods of time, tortured in solitary confinement for long periods of time, publicly shamed in national media due to Defendants' own press releases, and hurt in many other ways. No appellate relief can remedy or undo that.

116.   As in *Guttman*, abstention is inapplicable in Ms. Cohen's current claims. *See Guttman*, 446 F.3d at 1033. A federal lawsuit for damages resulting from ADA violations by prosecuting and adjudicatory parties in quasi-criminal or criminal proceedings is entirely separate from the state court proceedings and the substantive issues the parties prosecuted. *Id*.

117.   Ms. Cohen's 2022 Complaint in this federal district civil Court is entirely separate from the Colorado state district and appellate court criminal proceedings that have been pending in those state courts for the past eight years.

**EXHIBIT M**

118.    This Complaint filed in this Court is an ADA Title II suit concerned with presenting evidence to a civil jury to prove by a preponderance of the evidence that the Defendants in this case, while acting in their federally well-funded official capacities as a state district court judge and a state deputy district attorney, disregarded the U.S. Constitution and specific federal civil statutes.

119.    Conversely, the Colorado state court proceedings which are now in the Colorado Court of Appeals are concerned with allegations of state statutory elements of the Colorado state crime of theft beyond a reasonable doubt in a state criminal court.

120.    This case is about showing a jury the ways in which Defendants violated the U.S. Constitution and other federal statutes, not state laws, as they repeatedly denied Ms. Cohen access to the courts where they work.

121.    Any direct state appellate or state post-conviction relief that Ms. Cohen may or may not receive in the future won't and can't be based on ADA Title II like this suit is.

122.    Any relief from the coerced plea written by Defendant Kelly and accepted for entry by Defendant Hartman – one month after he was required to recuse, but weeks before he actually did recuse – in the state district court criminal proceedings cannot cure or even ameliorate the damages that Defendants have caused her by denying her access to the courts and retaliating against her, including holding her in solitary confinement without medications for five weeks in November and December 2021, violating her rights under the ADA as a qualified person with a disability, as alleged further below in this Complaint.

123.    There is no opportunity for anyone to file any ADA violations claims in any state court proceeding. *Id*. at 1291 (citing *Middlesex Cnty. Ethics Comm. v. Garden State*

*Bar Ass'n*, 457 U.S. 423, 432 (1982)); *Sw. Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1177-78 (10th Cir. 2001). This Court is the only forum in which Ms. Cohen can raise the federal claims she raises in this Complaint.

124.    Though the state proceedings and this federal ADA Title II Complaint are not "parallel," if this Court were to consider whether abstention would cause "irreparable injury," it could consider the evidence that the speedy trial period had already run prior to Defendants' discrimination against Ms. Cohen.

125.    This Court could decide that Defendants acted without jurisdiction when they had Ms. Cohen arrested on a bench warrant for "failure to appear" after she did appear, and then had her held in solitary confinement for five weeks without prescribed medications and without access to the state or federal courts, and that declining to hear her ADA Title II claims would leave her without any forum for those claims, while the state court proceedings are on direct appeal after the speedy trial period expired, causing "irreparable injury" in violation of her Constitutional rights, including her right to a speedy trial.

126.    **No Immunity.**  As demonstrated in this Complaint, Defendants do not have any immunity to this suit against them in their official capacities for these claims under these facts.

127.    **No Eleventh Amendment State Sovereign Immunity.**  Defendants are currently being sued in their official capacities only.  All Defendants are officers of the State of Colorado.

128.    Defendant Hartman and his successors are District Court Judges in the 20th Judicial District in Boulder, Colorado.  It is well established that a state district court judge

34

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 35 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 35 of 93
**EXHIBIT M**

is an officer of the state, and therefore a plaintiff's claims against a defendant in an official capacity as a state court judge are essentially claims against the state. *See Stump v. Sparkman*, 435 U.S. 349, 359 (1978).

129.   Defendant Kelly and her successors are Deputy District Attorneys for the 20th Judicial District in Boulder, Colorado.  This Tenth Circuit has ruled that a district attorney is also an officer of the state, and therefore a plaintiff's claims against a defendant in an official capacity as a district attorney are claims against the state. *Laidley v. McClain*, 914 F.2d 1386, 1392 (10th Cir. 1990), superseded on other grounds as recognized in *Dodger's Bar & Grill, Inc. v. Johnson Cty. Bd. of Cty. Comm'rs*, 32 F.3d 1436, 1440 (10th Cir. 1994).

130.   Furthermore, the office of the district attorney in any state "is an arm of the state, and therefore is treated as the state for purposes of sovereign immunity and the Eleventh Amendment." *Pettigrew v. Oklahoma ex rel. The Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1212 (10th Cir. 2013) (citing *Alden v. Maine*, 527 U.S. 706, 756 (1999)).

131.   The U.S. Supreme Court has ruled that Title II of the ADA, as applied to cases such as this case implicating the fundamental right of access to the courts, validly abrogates state sovereign immunity. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

132.   In *Lane*, the U.S. Supreme Court stated, "We find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services." *Id*. Congress may, however, abrogate the State's Eleventh Amendment immunity. To determine whether Congress has done so in a particular case, courts "must resolve two predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 36 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 36 of 93

**EXHIBIT M**

to a valid grant of constitutional authority." Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

133.    ADA Title II provides: "a State shall not be immune under the Eleventh Amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.

134.    The Eleventh Amendment states: "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *U.S. CONST. amend. XI*. The U.S. Supreme Court reiterated that "an unconsenting state is immune from suits brought in federal courts by its own citizens as well as by citizens of another state." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

135.    However, the U.S. Supreme Court has also ruled that state actors being sued in their official capacities – as Defendants are – for monetary damages suffered by a plaintiff deprived of Constitutional right of access to the courts as a result of the state actor defendants' violations of Title II ADA – as Plaintiff was – cannot claim state sovereign immunity as an affirmative defense.  *Lane*, 541 U.S. at 529.

136.    The Court of Appeals for the Tenth Circuit applied this reasoning from *Lane,* ruling that sovereign immunity cannot protect a state or state officials from suits under Title II of the ADA. *Id.*; *Guttman v. Khalsa*, 446 F.3d 1027, 1036 (2006).

137.    Defendants therefore cannot assert an Eleventh Amendment defense to this suit. There is no state sovereign immunity to defend against these claims.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 37 of
93
Case 3:23-cv-00073-SMR-WPK      Document 31-13      Filed 12/29/23     Page 37 of 93
EXHIBIT M

138.   **No Absolute Judicial Immunity or Qualified Prosecutorial Immunity.**
Defendants aren't entitled to absolute or qualified immunity in this case, either.  Absolute
and qualified immunity are defenses to defendants who are sued in an
individual capacity. *See Scheuer v. Rhodes*, 416 U. S. 232 (1974).  Judicial immunity is
a personal defense reserved for individuals. *Id*.  Judges and prosecutors who are sued in
their official capacities only, as Defendants here are, therefore cannot assert absolute or
qualified immunity to a suit such as this. *Id*.

139.   Title II of the ADA authorizes suits by private citizen plaintiffs for monetary
damages against individual defendants acting in an official capacity, as Defendants did,
who violate § 12132. *See* 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. §
794a).   Since Defendants are currently only being sued in their official capacities,
defenses of absolute or qualified immunity – such as judicial immunity or prosecutorial
immunity – cannot apply in this case. *Id.*

140.   As this Complaint and the evidence at trial will show, the Defendants in this
case acted knowingly and with intent to discriminate against Ms. Cohen on the basis of
her disability. As to Defendants' failure to accommodate, Ms. Cohen need not establish
discriminatory intent to show that Defendants' actions were taken "on the basis of
disability," "because any failure to provide reasonable accommodations for a disability is
necessarily because of disability." *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204
(10th Cir. 2018).  Their actions were intended to, and did in fact, deny her access – both
actual access as well as meaningful access – to both the Colorado courts and this federal
Court.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 38 of
93
Case 3:23-cv-00073-SMR-WPK     Document 31-13     Filed 12/29/23     Page 38 of 93
**EXHIBIT M**

141.    Defendants' violations of ADA Title II were taken in their official capacities – that is, while Defendant Hartman was working as a state district court judge who called himself "the Court" and while Defendant Kelly was working as a state deputy district attorney who called herself "the People."

142.    The facts detailed in this Complaint and the evidence that will be presented to the jury demonstrate how Defendants' acts discriminated against Ms. Cohen when they failed to accommodate her well-known and well-documented disability ("Claim One"), when they discriminated against her on the basis of that disability ("Claim Two"), and when they engaged in acts of retaliation against her on the basis of her disability and her requests for reasonable accommodations ("Claim Three").

143.    **Damages.**  Ms. Cohen may receive an award of compensatory damages in the event a jury finds that her damages were caused by Defendants' violations of ADA Title II, which are asserted in three claims against both Defendants. *See Guttman*, 446 F.3d at 1034.   Compensatory damages in an ADA Title II suit may include physical injuries, bodily harm, pain and suffering, emotional distress, loss of income, legal fees, court-ordered payments, and other expenses. *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997).   Included in the evidence of damages and amounts of damages that the jury will hear are: medical, hospital, clinic, and pharmacy bills incurred by Ms. Cohen and her insurer to treat the injuries she suffered as a result of being held in solitary confinement without medication, which are currently estimated to have exceeded $80,000 as of the filing of this Complaint, and which are ongoing; legal and travel expenses associated with being detained and extradited incurred by Ms. Cohen and others on her behalf, which are estimated to have exceeded $200,000; lost job interviews and resulting

lost wages; other lost opportunities; and amounts determined by a jury as compensatory damages for the extreme pain and suffering Ms. Cohen experienced due to Defendants' conduct in this case.

144.   The U.S. Supreme Court in *Lane* ruled that ADA Title II is one such statute that waives Eleventh Amendment sovereign immunity. *Lane*, 541 U.S. at 511.  In *Lane*, the U.S. Supreme Court specifically ruled that federal district courts have jurisdiction to hear suits such as this against state employees sued in their official capacities – as Defendants are – for monetary damages suffered by a plaintiff deprived of the Constitutional right of access to the courts as a result of the state actor defendants' violations of Title II of the ADA – as Plaintiff was. *Lane*, 541 U.S. at 512.

145.   Two years after its ruling in *Lane*, the U.S. Supreme Court expanded on damages in Title II cases, ruling in *U.S. v. Georgia* that a plaintiff can seek compensatory damages from a state for the official actions of state actors which are found to be ADA Title II violations to the extent that the plaintiff's claims also allege independent violations of the Constitution, reasoning that the denial of access to the courts that occurred in *Lane* was itself an independent violation of the Constitution in addition to being an ADA Title II violation. *United States v. Georgia*, 546 U.S. 151, 159 (2006).

146.   Like the allegations in *Lane* and in *U.S. v. Georgia*, all three counts in this Complaint allege both independent violations of the Constitution, including the denial of Ms. Cohen's access to the courts, as well as ADA Title II violations.

154. The allegations in this Complaint and the evidence presented to the jury will prove that the same conduct of the Defendants which violated ADA Title II also violated the

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 40 of
Case 3:23-cv-00073-SMR-WPK      Document 31-13      Filed 12/29/23      Page 40 of 93

**EXHIBIT M**

Constitution. This is why there is no Eleventh Amendment immunity available to Defendants in this case.

147.   The inquiry set forth by the U.S. Supreme Court in *U.S. v. Georgia* is instructive in this case. The three determinations it required are:

(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *U.S. v. Georgia*, 546 U.S. at 159.

148.   In the first step, this Court thus would "identify the [Defendants' official capacity] conduct that allegedly violated Title II's prohibition against disability discrimination in the provision of state services or programs." *Guttman v. Khalsa (Guttman II)*, 669 F.3d 1101, 1113 (10th Cir. 2012).

149.   Defendants violated Title II of the ADA by refusing her reasonable accommodations for her disability, discriminating against her on the basis of her disability, and retaliating against her after she requested the protections of the ADA.

149.   "The second step requires [the Court] to assess the asserted Fourteenth Amendment claims." *Guttman II*, 669 F.3d at 1113. The U.S. Court of Appeals for the Tenth Circuit has traced the roots of the right of access to the courts to several constitutional provisions. *Carper v. DeLand*, 54 F. 3d 613 (10th Cir 1995), quoting: *Petrick v. Maynard*, 11 F.3d 991, 994 (10th Cir.1993) (Fourteenth Amendment); *Ward v. Kort*, 762 F.2d 856, 858 (10th Cir.1985) (Fifth and Fourteenth Amendments); *Nordgren v. Milliken*, 762 F.2d 851, 853 (10th Cir.) (Privileges and Immunities Clause of Article IV,

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 41 of
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 41 of 93
**EXHIBIT M**

First Amendment right to petition for redress of grievances, Fifth Amendment, and Fourteenth Amendment), cert. denied, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

150.    Defendants violated Ms. Cohen's First Amendment right to access the courts per *Lane*, as well as her First Amendment right to petition the courts for redress of grievances when they kept her in jail on a bench warrant they knew was incorrect, after she had requested and been denied the reasonable accommodation of appearing by WebEx, then was allowed to appear by WebEx but not as an accommodation for disability, then was found to not have appeared at all when Defendants attempted to retroactively void her WebEx appearance. This was all done by Defendants knowing that as a result Ms. Cohen would not be able to access this Court or the state courts while unmedicated, unrepresented, and in jail.

151.    Defendants violated Ms. Cohen's Fourth and Fifth Amendment rights and privileges against unlawful searches and seizes and against self-incrimination when they denied her requests for accommodations based on disability and told her they needed her to give them more documentation from various medical providers, which they then mischaracterized as contradictory, and then issued their bench warrant to search her, arrest her, and compel her to make statements in custody without any Miranda advisement, without the lawyer she repeatedly requested, and without any process.

152.    Defendants' failure to afford Ms. Cohen any due process rights as they discriminated against her on the basis of her disability in violation of ADA Title II also violated her rights under the Sixth Amendment and the Fourteenth Amendment by denying her right to counsel, denying her right to confrontation, and denying her a pre-

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 42 of
93
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 42 of 93
**EXHIBIT M**

deprivation hearing when the record proves that she never made a knowing, intelligent, and voluntary waiver of her right to a due process hearing or her right to counsel.

153.    In violating Title II of the ADA by refusing to appoint substitute counsel when the record in the state proceedings proves that Ms. Cohen's ADC counsel Jonathan Willett advised the court on the record in a hearing, which the jury will hear, that he had an actual conflict that was unrelated to Ms. Cohen, had to withdraw after two years of representing her well, and had serious concerns that Ms. Cohen needed replacement counsel due to the symptoms of her disability, Defendants also denied Ms. Cohen her Sixth Amendment right to counsel, as applied to the states by the Fourteenth Amendment. *Id*. at 155; *Gideon*, 372 U.S. at 343.

154.    Since Ms. Cohen has alleged these actual Constitutional violations, "then [Defendants] cannot raise a sovereign immunity defense because `insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.'" *Guttman II*, 669 F.3d at 1113 (quoting *U.S. v. Georgia*, 546 U.S. at 159).

164. The third step in the *U.S. v. Georgia* analysis involves a determination whether, in the absence of an allegation of an actual constitutional violation, Congress has nonetheless validly abrogated state sovereign immunity. *Id*.

155.    As the Tenth Circuit has explained, "`Congress' power "to enforce" the [Fourteenth] Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct' than that which the Amendment itself proscribes." *Guttman II*, 669 F.3d at 1116 (quoting *Kimel*, 528 U.S. at 81). Since Ms. Cohen has alleged actual Constitutional violations

**EXHIBIT M**

accompanying Defendants' Title II violations, however, the Court need not reach step three of the analysis. Defendants have no immunity to these claims.

156.   Under Title II of the ADA and its implementing regulations, the right to counsel is also a reasonable accommodation for disabled individuals who otherwise would be excluded from participation in, denied the benefits of, and subjected to discrimination in attempting to access the courts and legal proceedings.

157.   The right to counsel also fulfills ADA Title II mandates to ensure that the court system's communications with disabled individuals are as effective as its communications with everyone else.  Defendants' own ADA compliance guides, as further cited in this Complaint below, also list representation as a reasonable accommodation for disability when a court user has the types of disabilities that Ms. Cohen has. Mr. Willett relied on those in a motion when he urged the state court to appoint replacement counsel, and they are in the record in the underlying case, which this Court has already ruled that it is taking judicial notice of, but then when called upon to take judicial notice of facts in favor of Ms. Cohen, which is the standard for any summary ruling, the Court does not.  It should.

158.   The record in the state court proceedings proves that Ms. Cohen never waived any of these rights.  For a waiver to be effective, "the facts and circumstances surrounding the waiver [must] make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of the waiver;" in other words, "a waiver must be knowing and voluntary." *Wilcox v. Aleman*, 3 F. App'x 920, 922 (10th Cir. 2001).

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 44 of
93
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 44 of 93
**EXHIBIT M**

159.     A waiver that is not knowing and voluntary "has been obtained in violation

of due process and is therefore void." *McCarthy v. United States*, 394 U.S. 459, 466

(1969). Moreover, "there is a presumption against the waiver of constitutional rights, and

for a waiver to be effective it must be clearly established that there was an intentional

relinquishment or abandonment of a known right or privilege." *United States v. Cherry*,

217 F.3d 811, 815 (10th Cir. 2000) (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)).


160.     Ms. Cohen never waived any of her rights; Defendants just summarily

denied them as retaliation for her having asked for accommodations such as: written

correspondence, written orders, extensions of time to file and to schedule hearings,

scheduling that allows her to attend doctors appointments and get hospital care, presence

of a service dog, and others.

172.     In a 2021 email to another judge, Defendant Kelly's colleague Michell

Sudano claimed that Ms. Cohen had "forfeited" her right to counsel, but the email

message didn't explain when or how that allegedly happened. Initially, when Mr. Willett

moved to withdraw and needed the state court to appoint replacement counsel, Ms.

Cohen advised the state court that since the statutory speedy trial period had run, she

could enter a *pro se* motion to dismiss at that time, rather than waste more judicial

resources appointing replacement ADC to enter, review the decade-long file, and

ultimately still move to dismiss.

173.     Defendant Hartman responded that he would not allow Ms. Cohen to move

to dismiss and that he would not dismiss the case even though he and Defendant Kelly

both agreed on the record that the statutory speedy period had expired. Ms. Cohen replied

that in that case she would need to be represented by replacement ADC as Mr. Willett had requested. Defendant Hartman was obligated at that point to appoint replacement counsel as he dismissed Mr. Willett. *See U.S. v. Pinkey*, 548 F.2d 305 (10th Cir. 1977).

174.    Now, in 2023, Judge Howard continues to do the very same things, as the record in 21CR1982 and the request for injunctions in this case all show.

175. There was never a finding in the state court proceedings that Ms. Cohen had knowingly or voluntarily waived her right to counsel. There was only a summary denial by Defendants of her right to counsel. Defendants later erroneously describe this to colleagues as a "forfeiture."

176.    Ms. Cohen did not waive or forfeit any of her Constitutional rights.

177.    Whether a criminal trial defendant has waived or forfeited a right is a question of law that a court reviews de novo. *See Stackhouse v. People*, 2015 CO 48, 386 P.3d 440.  There is a difference between waiver and forfeiture. *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *see People v. Lopez*, 129 P.3d 1061, 1065 (Colo. App. 2005). Waiver is the "intentional relinquishment or abandonment of a known right," while "forfeiture is the failure to make the timely assertion of a right." *Olano*, 507 U.S. at 733, 113 S.Ct. 1770; *see also People v. Rediger*, 2018 CO 32, 416 P.3d 893.  Applying these laws to the facts in the case, if you look at ALL the facts in the case, including the Bergerud transcripts and the emails received by Ms. Cohen from prior counsel, none of which has been sent to the Court by the Defendants, and which should have been what the Court requested in response to its alleged "confusion" about the facts underlying the repeated deprivations of counsel in this case, which the ruling judges have admitted have been retaliation for the ADA requests for

**EXHIBIT M**

accommodation.   Judge Howard ruled that he was denying counsel to Ms. Cohen because she is disabled!  He and Judge Hartman both have decided that she has caused her own disability, disregarding the medical opinions from licensed physicians, and Judge Howard said aloud on the record, "**I hate** [the symptoms of that disability]," yelling "stop it" and "shut up" at Ms. Cohen as she asked for a lawyer.

178.   As detailed in this Complaint, Defendants' actions that violated ADA Title II also independently denied Ms. Cohen multiple Constitutional rights.

179.   The Tenth Circuit applies the Eighth Amendment's subjective deliberate-indifference test to conditions-of-confinement claims brought by pretrial detainees. *Clendon v. City of Albuquerque,* 79 F.3d 1014, 1022 (10th Cir. 1996). Eighth Amendment deliberate-indifference standard is appropriate for pretrial detainees even though a detainee's rights are "at least as great" as those of a convicted prisoner. *Id*.

180.   The Fourteenth Amendment's Due Process and Equal Protection Clauses also prohibit the imposition of significantly harsher conditions of confinement based on disability, rather than the inmate's conduct. Just as a State cannot make it a "criminal offense for a person to be mentally ill," *Robinson v. California*, 370 U.S. 660, 666 (1962), states may not subject individuals with physical or mental disabilities to "atypical and significant hardship within the correctional context" just because they are disabled, *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005). Yet Defendants consigned Ms. Cohen to atypically harsh conditions of confinement, based on her disability and ordered by their erroneous warrant alleging she had failed to appear when they knew that she had in fact appeared.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 47 of 93
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 47 of 93
EXHIBIT M

182. A jury could find that these violations entitle Ms. Cohen to an award of compensatory damages pursuant to the U.S. Supreme Court's rulings in *Lane* and *U.S. v. Georgia* that ADA Title II validly abrogates States' Eleventh Amendment immunity in these circumstances. *Lane*, 541 U.S. at 530; *U.S. v. Georgia*, 546 U.S. at 160.

**183.   Statute of Limitations.**  Defendants have been violating ADA Title II by denying Ms. Cohen reasonable accommodations, discriminating against her on the basis of disability, and retaliating against her since the initial trial of the state court proceedings since 2014: The Colorado Court of Appeals ruled that Defendants had misrepresented the law to a criminal jury and had violated Ms. Cohen's Constitutional rights in 2014 to 2015, including denying her rights to counsel, presence, and confrontation at that time.

184.   In the In considering how the applicable two year statute of limitations, which derives from section 13-80-102 of the Colorado Revised Statutes, applies to ADA Title II claims, the Tenth Circuit has decided that the "repeated violations doctrine" applies, because its "goal of full participation" is "consistent with and suggestive of the repeated violations doctrine in Title II, which divides what might otherwise represent a single, time-barred cause of action into several separate claims." *Hamer v. City of Trinidad*, 924 F.3d 1093, 1100, 1106 (10th Cir. 2019); *Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016); *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004).

185.   Defendants are wrong in their response to the latest motion that the continuing violations doctrine; the Tenth Circuit Court of Appeals found in *Hamer* that it absolutely applies.  The Tenth Circuit Court of Appeals in *Hamer* discussed the statute of limitations in Title II cases, considering "exactly when and how" a public entity violates

Title II, finding that this, "in turn, affects how the applicable statutes of limitations operate."

*Hamer*, 924 F. 3d at 1102.

186.    The *Hamer* court asked, "Does a public entity violate Title II and section 504

only when it initially constructs or creates a non-compliant service, program, or activity?"

*Id*. at 1103.   It answered: "If so, a single statute of limitations accrues from the day a

qualified individual with a disability first discovers he or she has been injured by the

service, program, or activity. The statute of limitations, in this scenario, would bar any

lawsuit brought after the limitations period ends." *Id*. at 1103.

187.    The *Hamer* court next asked, "Or does a public entity violate Title II and

section 504 repeatedly until it affirmatively acts to remedy the non-compliant service,

program, or activity?" *Id*. at 1105.   It answered: "In that situation, **a qualified individual's**

**initial discovery that he or she has been injured does not trigger just one statute of**

**limitations that bars any lawsuit brought after the limitations period ends."** *Id*. at

1106.

188.    The *Hamer* court went on to explain: "**Rather, because the public entity**

**commits a new violation (and the qualified individual experiences a new injury)**

**each day that it fails to act, the statute of limitations effectively functions as a 'look-**

**back period**,' *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1028-29 (10th

Cir. 2007), restricting an individual's right to relief to those injuries suffered (1) during the

limitations period immediately prior to filing suit and (2) while the suit is pending." *Id*. at

1108.

189.    The *Hamer* court summarized its answers to questions about how the

Colorado's general two-year statute of limitations governed Plaintiff's claims by ruling:

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 49 of
Case 3:23-cv-00073-SMR-WPK        Document 31-13      Filed 12/29/23    Page 49 of 93
**EXHIBIT M**

"We hold that a public entity violates Title II of the Americans with Disabilities Act *each day that it fails to remedy* a noncompliant service, program, or activity. As a result, the applicable statute of limitations does not operate in its usual capacity as a firm bar to an untimely lawsuit. Instead, it constrains a plaintiff's right to relief to injuries sustained during the limitations period counting backwards from the day he or she files the lawsuit and injuries sustained while the lawsuit is pending." *Id*. at 1107. The utility of the continuing violation doctrine is that "as long as one of the separate wrongful acts contributing to the collective conduct 'occurs within the filing period,' a court may consider 'the entire time period'—including those separate acts falling outside the filing period— 'for the purposes of determining liability.'" *Id*. at 1099 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

190.    An important caveat to the continuing violation doctrine, however, is that it "is triggered `by continual unlawful acts, not by continual ill effects from the original violation.'" *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011) (quoting *Parkhurst v. Lampert*, 264 F. App'x 748, 749 (10th Cir. 2008) (unpublished)).

191.    The jury may consider the entire time period, including those separate acts falling outside the filing period, for the purposes of determining liability. *Id*.  The jury may also consider "continual ill effects from the original violation" in computing compensatory damages it finds under ADA Title II. *Id*.

192.    To summarize the applicable statute of limitations period for this case then: For the purposes of determining liability, the jury in this case may consider Defendants' actions all the way back to 2014.

49

**EXHIBIT M**

193.   For purposes of determining compensatory damages it finds under ADA Title II, the jury may consider the continual ill effects Ms. Cohen has suffered due to Defendants' actions starting in 2014.

194.   The jury will hear horrific disability discrimination from Defendant Hartman in 2014, including when he illegally removed her from the hospital over a doctor's orders and a Colorado statutory order that she remain there, illegally ordered her medication to be denied, illegally refused to extend deadlines, illegally told jurors that she was responsible for her own disability, illegally sentenced Ms. Cohen to six years in prison, knowing she wasn't guilty of theft, and knowing she would not receive medication he had ordered her to take, and when he told a packed courtroom that disability was "irrelevant and embarrassing," and more.  Discovery is the proper place to ask for more factual detail of these horrors, not serial orders that she amend the Complaint and publish more and more trauma for the world to read.

195.   **CLAIM ONE: ADA TITLE II – FAILURE TO ACCOMMODATE.**  The ADA was enacted exactly because people like Defendant Hartman say that disability is "irrelevant and embarrassing." *See* 42 U.S.C. § 12132.

196.   ADA Title II was intended not only to remedy discrimination in the form of intentional exclusion, but also to mandate reasonable modifications to existing policies and to otherwise reasonably accommodate individuals with disabilities. *See* 42 U.S.C. § 12101(a)(5).  The ADA imposes an affirmative duty on a public entity to make reasonable accommodations for qualified individuals with disabilities. 28 C.F.R. § 35.130(b)(7) (2014).  ADA Title II provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 51 of
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 51 of 93
**EXHIBIT M**

services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity. *Lane*, 541 U.S. at 517.

197.    "Qualified individuals" under the ADA are those individuals with disabilities

who can meet a public entity's essential eligibility requirement," if provided reasonable

accommodation. 28 C.F.R. § 35.104.

198.    **Ms. Cohen is a "qualified individual with a disability."** Under Title II of

the ADA, Ms. Cohen was and is a "qualified individual with a disability" as defined by 42

U.S.C. § 12132(2) because she has over two decades of medical records – and

Defendants have had copies of these records since 2014 – from physicians who have

treated her for the neurological deficit disorder diagnosis, which impacts her ability to

work, read, sleep, and do other everyday things.   Historically: Ms. Cohen's first

neurological diagnosis as a child was a migraine disorder. She experienced painful

headaches, dizziness, and extreme sensitivity to light. She was unable to attend school

regularly. Medication relieved some of her symptoms, but also caused others, such as

stomachaches and ulcers.   While in high school, she was also treated for depression,

anxiety, and an auditory processing disorder. Her medical records show that she was

often unable to sleep or to concentrate when awake.   She developed anxiety attacks and

a panic disorder during law school, and after graduation her medical records show a "rule

out" diagnosis of bipolar disorder from several physicians. Notes from her doctors indicate

that she was having difficulty breathing throughout the day due to bouts of severe panic.

199.    While practicing law in Boulder, Ms. Cohen was hospitalized at Boulder

Community Hospital for with a toxic epidermal necrolysis reaction to Lamictal, a

medication she was prescribed for suspected bipolar disorder, which was later ruled out

and she was diagnosed with dyslexia, ADHD, and other diagnoses that Judge Martinez and his clerks find hilarious.

200.   This medication reaction caused the skin on her neck, abdomen, and arms to shed. It was very painful. Ms. Cohen was unable to move her body without a nurse's assistance for several weeks.   That During this time, Ms. Cohen retained paid legal counsel to inform her clients and the OARC of her illness and hospitalization.   The OARC staff attorney, who has since resigned, responded that it "was not [OARC's] job to help adversaries like Ms. Cohen," disregarding any duty to accommodate Ms. Cohen's disability and laughing on a recorded teleconference call hosted at OARC's office when Ms. Cohen's counsel inquired about whether OARC might be subject to Title II of the ADA. OARC and Defendant Kelly's predecessor DA, who has also since resigned, chose at that time to work together to press criminal charges against Ms. Cohen, alleging that she had "abandoned" her clients. That wasn't true though.   When they chose to prosecute her because of the symptoms of her disability, including the need for hospitalization and the resulting need to close her practice, that was retaliation on the basis of disability. They prosecuted her because she is disabled, basing the prosecution on symptoms of disability, not on elements of a crime or probable cause.   This violated Title II.   This was the beginning of the decade-long fun they've had harming her.

201.   They knew the truth was that Ms. Cohen had been hospitalized and was working with hired counsel, whom she was paying tens of thousands of dollars, to close her small solo law firm because she could no longer practice law, as Dr. Stevens's later medical reports would confirm had been what really happened.

**EXHIBIT M**

202. After being "maliciously prosecuted," as Defendant Kelly has called her office's 2014 treatment of Ms. Cohen, records show that Ms. Cohen's physical and mental states deteriorated significantly while she was wrongfully imprisoned waiting for her appellate reversal. Records from that time show that she suffered blackouts, hallucinations, and was unable to eat or sleep for weeks at a time, many times.  Now, Judge Howard removed her lawyer and says he is sending her back for more of that, and Judge Martinez thinks that's funny.

203.   Ms. Cohen's disability was untreated for more than two years as she languished in prison. Defendant Hartman said at a sentencing hearing in 2015 that he would be sentencing Ms. Cohen more severely for having requested disability accommodations when her doctor contacted the court to request that she be allowed to finish treatment prior to sentencing as an accommodation for disability. Instead, Defendant Hartman ordered Boulder Police Department officers to extract Ms. Cohen from the hospital, and then he sentenced her, illegally, to prison. This is just one specific example of Defendants' retaliation on the basis of disability in violation of ADA Title II.

204.   Ms. Cohen was placed in solitary confinement and other torturous conditions during those two years. Her medical records indicate that this harsh treatment, combined with the denial of medical treatment, significantly worsened her disability.

205.   After the unanimous appellate reversal by the Colorado Court of Appeals, Ms. Cohen was able to return to medical treatment for her disability. The providers who saw her after release note that she had experienced significant episodes of psychiatric decompensation.

**EXHIBIT M**

206.   At her physician's orders, in 2018 Ms. Cohen had whole-exome genome sequencing testing, and then in 2020 she neuropsychiatric testing, as providers pursued a more precise diagnosis.   As documented in her previous and ongoing medical diagnoses, Ms. Cohen lives with major, permanent neurocognitive deficits which substantially limit her day-to-day life activities, as set forth in painstaking detail by Colorado-licensed disability expert Dr. David Stevens in his neuropsychological evaluation report.  He wrote that she is disabled.  Defendants got a copy.

207.   Dr. Stevens's report is most persuasive, perhaps, because he is not Ms. Cohen's expert. He was hired and paid by the State of Colorado.  Dr. Stevens was retained in 2014 by the Colorado Office of Attorney Regulation Counsel ("OARC") to evaluate Ms. Cohen for purposes of disability inactive status proceedings. OARC stated in an email that its "hope is that [Dr. Stevens] can confirm that Ms. Cohen is not in fact disabled."  Dr. Stevens's report expressly states that after examining Ms. Cohen several times in person in his Denver clinic office, then interviewing all of her physicians and other medical providers in extended telephone interviews, and then reviewing treatment files and records they sent to his office, spanning a treatment period of the previous fifteen years, **his expert medical opinion is that Ms. Cohen "suffers from a medical disability that prevents her from practicing law"** without reasonable accommodations.

208.   Dr. Stevens's expert diagnostic report has been maintained as a part of Ms. Cohen's state court and attorney regulation files since 2015. Both Defendants have had access to the report confirming Ms. Cohen's disability since that time. They dismissively refer to the report several times on the record in 2014CR437.

225. Employees of the Boulder District Court and the Boulder District Attorney's Office, including Defendants Hartman and Kelly, have had personal knowledge of Dr. Stevens's report and its contents since 2014.

209.   Defendants have discussed Dr. Stevens's report and its findings on the record in the Boulder District Court case numerous times between 2015 and the present, and they have published the report to many other people, both with and without Ms. Cohen's consent. Even so, Defendants both say that they "don't believe in" disability "in this case."

209.   Defendants say they don't think her disability "is real." Defendant Hartman ruled from the bench that "depression isn't real" during an earlier motions hearing in the retrial.   Defendants have decades of medical records documenting the diagnosis, treatment, progression, and expected course of Ms. Cohen's disability, including Dr. Stevens's expert report ordered and paid for by the State of Colorado. All of these records contain diagnoses of disability. Many of them suggest reasonable accommodations for Ms. Cohen to request from the courts.  It isn't just that Defendants don't like Ms. Cohen, or even that they resent the appellate reversal. Defendants specifically say they just refuse to "entertain" her "shenanigans." Defendant Hartman has said, from the bench, as "the Court," that he thinks that anyone who can pass a bar exam can't be neurologically disabled. He ruled that Ms. Cohen's "supposed illness" has nothing to do with her conduct in this case, even though he has thousands of pages of medical records in which licensed physicians tell him otherwise.  Denying her accommodations of having a support person with her, having counsel, having medications, having extended deadlines, having time to go to medical appointments,.. all because he "doesn't believe in" her disability, that is a

**EXHIBIT M**

denial of accommodations on the basis of disability, and taking them from her because of her disability is retaliation based on the disability.

210.    Successor defendants have also said that Ms. Cohen's disability is "not real."  Colorado law requires an analysis of how disability affects a criminal defendant and how it might be affecting any "waiver" of the right to counsel, yet Judge Howard said last week, as he denied her right to counsel and said she can't have appointed counsel: "I don't think I have to do that.  I'm not going to do that."  The actual ruling is the proof of the ADA violation, which is an independent cause of action against Judge Howard.  The actual ruling can be challenged on appeal, but the harm caused by the discrimination and retaliation in making the ruling are what this court could have enjoined after her latest motion for injunction, but the Court chose instead to laugh at Ms. Cohen when she called Chambers.

211.    Federal law says disability is "real" when it impairs major life activities. *See* 42 U.S.C. § 12131 et seq., 29 U.S.C. § 794(a); 28 C.F.R. § 35.101, et seq.

232. The U.S. Court of Appeals for the Tenth Circuit ruled that "there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions [regarding diagnosis and treatment of disability]." *Jackson v. Fort Stanton Hospital,* 964 F.2d 980 (10th Cir. 1992).

212.    The Colorado Supreme Court also says that disability is "real," and has established procedures for disabled attorneys to follow when their disabilities affect their practices. *See* C.R.P.C. 251. Ms. Cohen voluntarily followed those procedures, and the Colorado Supreme Court placed her law license in Disability Inactive Status, ruling that due to her disability she also must be represented in those quasi-criminal proceedings.

56

**EXHIBIT M**

234. Ms. Cohen's disability was and is well-known and well documented among Defendants' staff in various locations across the State of Colorado.

213.   Ms. Cohen's disability has been the subject of ridicule in local newspapers who have published "press releases" from Defendants in retaliation for her having requested disability accommodations.  Defendants call Plaintiff's disability her "shame" in these press releases.   They retaliate against her by publishing her private health information in newspapers, as recently as 2023 their successors continue doing this.

214.   A "public entity" includes any department or agency of a state or local government. 42 U.S.C. § 12131(1)(B).  Defendant Hartman acted as "the Court" – a "public entity." Defendant Hartman, acting in his official capacity, fits the definition of "a public entity" for purposes of Title II because he is a state court judge who was acting in his official capacity when he repeatedly and very publicly discriminated against Ms. Cohen.  When he acted in his official capacity, as he did when he acted toward Ms. Cohen, the law is clear that he was acting as the state's judicial branch of government. *Stump,* 435 U.S. at 359.

215.   The transcripts of the state court case 2014CR437, which the Colorado Court of Appeals unanimously reversed in light of his many Constitutional errors, all show that Defendant Hartman always referred to himself as "the Court."

216.   When Ms. Cohen requested accommodation for her disability, Defendant Hartman told her, "Don't argue with the Court."

217.   When appointed counsel for Ms. Cohen had to withdraw in 2021 from the representation after two years of working well with Ms. Cohen, because he discovered a personal conflict due to a personal relationship between a member of his immediate

**EXHIBIT M**

family with a prosecution witness, this lawyer told Defendant Hartman, who was on the bench, that "the Court" must appoint new counsel for Ms. Cohen as an accommodation for disability. Instead, Defendant Hartman blamed Ms. Cohen for counsel's motion to withdraw, and refused to appoint counsel.  Judge Howard is now doing the exact same thing in 2023.

218.   Defendant Hartman and his successor Defendant Howard have both ruled that "the Court" would find that Ms. Cohen's behavior is "the real reason" for counsel withdrawing.  They both refuse to assess how her disability may be impacting any of this. (This Court's most recent rulings are doing the same thing.)

219.   Conflicted counsel responded that were attorneys who wanted to work with Ms. Cohen, urging Defendant Hartman that the aspects of Ms. Cohen's illness that he disliked so intensely were caused by her depression and disability, and "not her fault." Defendant Hartman replied that "the Court doesn't believe [that]." The Court had documentation of medical records saying what Mr. Willett said; the Court had no discretion to "not believe" medical records.

220.   Defendant Hartman refused to appoint replacement counsel, even though replacement counsel was requested by conflicted counsel and by Ms. Cohen. Instead, he said, "I'm sure Ms. Kelly will tell me what to do from now on."

221.   The actual refusal to appoint counsel is not what Plaintiff is asking this Court to address.  What this Court can address is the discrimination and retaliation which are the **admitted bases** for those rulings.  Not the actual rulings.

222.   Months later Ms. Cohen again told Defendant Hartman on a court WebEx call in 2021 that she needed an attorney as an accommodation for disability. He again

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 59 of
93
Case 3:23-cv-00073-SMR-WPK      Document 31-13     Filed 12/29/23      Page 59 of 93
EXHIBIT M

denied accommodations and said, "it doesn't matter."  Judge Howard said the same thing
in 2023.

223.    Defendant Hartman ruled that "the Court" would not hear evidence of
treatment for disability because "[the Court thinks] it is irrelevant and embarrassing."
Refusing to allow Ms. Cohen to introduce evidence of medical treatment because that
medical treatment was for disability is just one example of Defendants' discrimination
based on disability, because a similarly situated defendant would be allowed to present
evidence of medical treatment. Ms. Cohen had followed all required disclosure rules and
had been examined by the state's experts.

224.    Defendant Hartman told courtroom spectators that "the Court finds that
presumably Ms. Cohen's disability is voluntary," even though her physician had sent the
Court a letter finding otherwise.

225.    Defendant Hartman signed warrants on multiple occasions as "the Court"
alleging that "the Court" disagreed with Ms. Cohen's doctors as to her need for treatment
for disability, having her arrested and jailed in solitary confinement when she sought
medical care.

226.    Defendant Hartman and his successors have called themselves "the Court"
at every turn as they either refused to listen to Ms. Cohen's request for disability
accommodations or just summarily denied them without any inquiry.

227.    Defendant Hartman called himself "the Court" when he signed warrants that
lacked factual bases (such as the November 2, 2021, warrant alleging that Ms. Cohen
had failed to appear at a hearing before him, when she had in fact appeared for the entire
hearing in which he heard evidentiary pretrial issues from both Ms. Cohen and the

**EXHIBIT M**

Defendant Kelly and then he ruled as "the Court" on those motions, -- so he knew she

had appeared; he knew there was no failure to appear) to have Ms. Cohen arrested and

held in solitary confinement.

228.    Defendant Hartman, calling himself "the Court," used fabricated arrest

warrants like that one on three separate occasions in this case to retaliate against her

Ms. Cohen. All three times, he reported to the press that Ms. Cohen was "faking" her

disability "to avoid appearing for court dates." **The U.S. Supreme Court has ruled that

a judge has no discretion to insert their own personal animus and hatred of

developmental disabilities in this way.** *See Youngberg v. Romeo*, 457 U.S. 307.

229.    All Defendants have repeatedly inserted into both the court proceedings as

well as the national news media since 2014 their own personal opinions that Ms. Cohen

is "faking." There are repeated examples of this disability discrimination and retaliation by

Defendants dating back to 2014, and a similarly situated defendant would have been able

to rely on medical records and would not have been subject to this.

252. Defendants also discriminate and retaliate by continuing to insert themselves as

witnesses in the media and in the proceedings by opining on their view of the illness that

causes Ms. Cohen's disability. This is illegal. *See also Ungar v. Sarafite*, 376 U.S. 575,

84 S. Ct. 841, 11 L. Ed. 2d 92 ("The judge who accused the witness of malingering was

not a medical expert. The judge should not be left to decide on the basis that he saw the

witness and therefore could be depended upon to determine that he was not ill.)

230.    When Ms. Cohen followed medical orders from her physician for treatment

of her disability, Defendant Hartman claimed, "the Court finds that she checked herself

into a hospital to avoid coming to court," and then he ordered her body to be violently

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 61 of
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 61 of 93
**EXHIBIT M**

removed by police from medical treatment and tortured in solitary confinement.  It is not possible to "check oneself into" a hospital.  Admission requires a physician's order.

231.    Defendant Hartman called himself "the Court" every time he harmed Ms. Cohen himself, and every time he ordered state actors like police officers to harm Ms. Cohen for him.

232.    A judge like Defendant Hartman and his successors who acts in his official capacity in a state's judicial system is acting as a "public entity" for purposes of Article II of the ADA. *Lane*, 541 U.S. at 515.

233.    The U.S. Supreme Court ruled in *Lane* that a state's judicial system is a "public entity" whose courts fit the definition of "services, programs, or activities," according to the U.S. Supreme Court's holding in *Lane*. *Id*.

234.    Defendant Kelly acted as "the People" – also a "public entity." Defendant Kelly, acting in her official capacity, fits the definition of "a public entity" for purposes of Title II because she is a deputy district attorney, a state prosecutor who was acting in her official capacity when she repeatedly and very publicly discriminated against Ms. Cohen. When she acted in her official capacity, as she did when she acted toward Ms. Cohen, the law is clear that she was acting as the state's judicial branch of government. *Laidley,* 914 F.2d at 1392.  The transcripts of the retrial proceedings in state court case 2014CR437, which Defendant Kelly chose to first-chair after the Colorado Court of Appeals unanimously reversed her colleague and then he resigned mid-term, will show that Defendant Kelly always referred to herself as "the People."

**EXHIBIT M**

235.    Defendant Kelly used her state-issued email account and called herself "the People" when she corresponded with the public and issued press releases to The Daily Camera and other news outlets referring to Ms. Cohen using disability-related slurs.

236.    Defendant Kelly called herself "the People" when she authored, signed, and publicly filed over a dozen pleadings in this case referring to Ms. Cohen's disability and its symptoms as "manipulative behavior," "chicanery," "strategery [sic]," "malingering," "deception," "trickery," "schemes," "antics," "drama," and other pejorative terms.

237.    Defendant Kelly called herself "the People" when she objected in writing to Ms. Cohen's application to participate in federally funded mentoring programs for disabled law school graduates in Denver.

238.    Defendant Kelly called herself "the People" when she presented Defendant Hartman, acting as "the Court," with a false and fabricated warrant application and asked him to order Ms. Cohen to be removed from medical treatment for her disability and placed in solitary confinement in jail. Acting as "the Court," he did sign it, and Ms. Cohen was in fact arrested and denied treatment.

239.    Defendant Kelly called herself "the People" when she urged Defendant Hartman to refuse Ms. Cohen's requests for reasonable accommodations based on her disability.

240.    Defendant Kelly called herself "the People" when she asked Defendant Hartman, acting as "the Court," to ignore the decades of documents and expert medical reports detailing Ms. Cohen's disability, which both Defendants have had for years.

241.    Defendant Kelly called herself "the People" when she urged Defendant Hartman, as "the Court," to instead just summarily and without allowing Ms. Cohen to

**EXHIBIT M**

answer or present evidence, enter an order finding Ms. Cohen "preliminarily incompetent" without any basis in fact. He did. This caused the retrial to "stay" for over a year. It also froze Ms. Cohen's access to prescribed medications and other disability treatment.  That was retaliation, because it was an adverse action taken against her not on the bases in the statute, but with the intent to harm her because she is disabled, and it did.  We know she didn't base this on the statute, because we have a year of emails of her sending plea offers to Mr. Willett.  If Defendant Kelly truly believed Plaintiff were incompetent, she would know she could not make plea offers.  She made plea offers because she knew Plaintiff was not incompetent.

242.   Defendant Kelly called herself "the People" when she sent plea offers in writing to Ms. Cohen's appointed defense counsel during the year in which Defendant Hartman, acting as "the Court," stayed a criminal retrial prosecution. In those written plea offers, Defendant Kelly, as "the People," told Ms. Cohen's lawyer, "she has had a year to accept a plea to one felony count to resolve this case."

243.   Acting as "the People," however, Defendant Kelly knew that once "the Court" had (summarily and without any evidence) found a criminal defendant to be "preliminarily incompetent," the Constitution did not allow her, as "the People," to present that person with a plea, much less to threaten to retaliate against a "preliminarily incompetent" party who legally cannot sign or even consider a plea.

269. Defendant Kelly called herself "the People" when she explicitly excluded and summarily denied an intake evaluation to Ms. Cohen. She wrote that "the People" would "not allow" Ms. Cohen to participate in the Boulder District Attorney's federally funded

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 64 of 93
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 64 of 93

EXHIBIT M

mental health court, even though she and her case both met the intake requirements. Her successors are doing the exact same thing.

244.   Defendant Kelly called herself "the People" every time she harmed Ms. Cohen, and every time she petitioned other state actors like Defendant Hartman and other judicial employees and police officers to harm Ms. Cohen for her.

245.   A prosecutor like Defendant Kelly acts as a "public entity" for purposes of Title II because, by her own repeated admissions, she is a representative of "the People" in the state's judicial branch of government. *Laidley,* 914 F.2d at 1392; 42 U.S.C. § 12131(1)(A).

246.   As the Tenth Circuit explained, "a public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individuals request an accommodation." Id. at 1197-98.

247.   Hospital documentation sent to the court by the admitting physician prior to the illegal sentencing in 2015 explained that a medical doctor ordered Ms. Cohen to be hospitalized. The court received the order of involuntary hospitalization. Contrary to the jokes on the record, the doctor's order makes no mention of suicide; Ms. Cohen was hospitalized for medication management. The involuntary hold itself stated that it was necessary due to potential sedating effects of medication. There was no suicide attempt. There was only a notice of disability and a physician's order for medical care, both of which the court disregarded. The court announced to the public that it had summarily concluded that Ms. Cohen created her disability. It was her fault, Defendant Hartman told the audience in his courtroom.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 65 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 65 of 93
EXHIBIT M

248.   A "disability" includes a mental impairment that substantially limits one or more major life activities of the individual. 42 U.S.C. § 12102(1)(A). The ADA's definition of disability spans a broad range of impairments. 28 C.F.R. § 35.104 (2011) (defining "disability"). Under the ADA, a "disability" refers to "a physical or mental impairment that substantially limits one or more of the major life activities of the disabled person; a record of such an impairment; or being regarded as having such an impairment." *Id*.

249.   Ms. Cohen has a history of illness resulting in disability that has been known to Defendants since she was admitted to the bar in 2010. The Colorado Supreme Court published a decision ruling that she is disabled and, as a result, granting her petition at that time to place her law license in good standing Disability Inactive Status.

250.   Defendants later petitioned the Colorado Supreme Court to order Ms. Cohen to be "removed" from Disability Inactive Status, criminally prosecuted, imprisoned, and disbarred, all while refusing to accommodate her disability. The Colorado Court of Appeals unanimously reversed the criminal convictions that Defendants won in 2014 by misrepresenting the law to a jury.

251.   OARC testified that Ms. Cohen's attorney Norm Mueller had informed OARC of her disability. Mr. Mueller discussed disability accommodations and the ADA's prohibition on discrimination. OARC responded not by following U.S. Supreme Court precedent and federal statutory law, but by deciding to ignore it. OARC testified that instead of following the ADA and Colorado Rule 254, it decided to treat Ms. Cohen and her disability as its "adversaries." OARC then solicited the prosecutorial misconduct in 14CR437, which resulted in an overturned criminal prosecution for what Colorado Rule of Professional Conduct 254 specifically says is not a crime.

**EXHIBIT M**

252.    ADA regulations expressly include "any mental or psychological disorder such as emotional or mental illness, or specific learning disabilities," including "deficit disorders" and "attention deficit hyperactive disorder," as well as "depression," "post-traumatic stress disorder," and "bipolar disorders." *Id*.

253.    Ms. Cohen is a qualified individual with a disability as defined by 42 U.S.C. § 12132(2) because she has a deficit disorder diagnosis. The record in the state court proceedings is undisputed that Plaintiff is disabled, and is substantially limited in major life activities, including working and sleeping, and therefore, has "a disability" within the meaning of the ADA, as confirmed in an expert forensic medical report.

280. The Colorado Supreme Court granted Ms. Cohen the attorney registration good standing status known as "Disability Inactive Status" prior to the events giving rise to this case.  Ms. Cohen voluntarily transferred her law license to Disability Inactive Status.

254.    Rule 251 required Defendants and their colleagues to keep Plaintiff's disability confidential, and to provide her with reasonable accommodations.  Instead, Defendants emailed documentation of Plaintiff's disability to members of the Colorado Bar Association, a University of Colorado Law listserv, various police departments, and several news outlets.

255.    Defendant Hartman and his successors have repeatedly denied Ms. Cohen conflict-free counsel at multiple critical stages of the retrial, refusing to appoint replacement ADC when Mr. Willett was forced to withdraw due to a conflict that had nothing to do with Ms. Cohen. As Mr. Willett told the state court, every lawyer who had been appointed by Defendant Hartman to represent Ms. Cohen in the retrial had filed a motion to withdraw, all citing their own personal and professional conflicts which had

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 67 of
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 67 of 93
**EXHIBIT M**

nothing to do with Ms. Cohen. For example, two of the lawyers had business contracts with prosecution witnesses, one of the lawyers had a full calendar, and one of the lawyers had a family relationship with an adverse witness. None of these things are Ms. Cohen's fault. She never terminated any of her lawyers, and she was never given an opportunity to waive their conflicts.

256.    If the jury finds that Defendant Hartman knew that these lawyers were conflicted before or when he appointed them, it could find that his continuous pattern and practice of appointing lawyers he knew would have to withdraw was a discriminatory practice of its own, for the purpose of building a basis to improperly cite when he completely denied Ms. Cohen's right to counsel, which by itself was disability discrimination when he ruled on the record that he would deny replacement counsel due to Mr. Willett having testified that she needed counsel as an accommodation for disability.

257.    At a hearing on February 23, 2021, the court conflated the procedure for entering a plea of not guilty by reason of insanity ("NGRI") with the procedure for entering forensic medical records into evidence at trial. At that WebEx hearing, the court said on the record, "we do find that there is basis to enter an insanity plea," without making any findings of fact or conclusions of law. Ms. Cohen sent an email to current counsel, who then interjected and clarified that this was incorrect. Ms. Cohen is not entering an NGRI plea. Ms. Cohen's plea is "not guilty." Discovery in this lawsuit might examine whether Defendant Hartman had intended to enter an insanity plea contrary to the medical evidence he had received from state experts at that time.

258.    The court erred when it initially suggested entry of an insanity plea and then an NGRI plea, but it did then acknowledge its error when counsel interjected. The court

**EXHIBIT M**

issued a minute order clarifying that the evaluation was ordered "pursuant to C.R.S. § 16-8-107 in order to introduce expert testimony regarding a mental condition," not NGRI. However, in retaliation for Ms. Cohen having asserted disability, Defendants attempted to publicly shame her in front of a full public WebEx audience by reading aloud an insanity advisement and asked Defendant to agree to an understanding of it, even though she had not asserted any such plea. There was no basis for that advisement. The court went on to attach a copy of Justice Samour's insanity advisement from James Holmes' 2016 Arapahoe County case to its minute order, and then forwarded that to national news media.

258.   In 2015, after a trial in which this also endorsed repeated rulings found by the Court of Appeals to constitute structural error, Ms. Cohen's doctor begged Defendants, in their official capacities, to allow her to continue hospital treatment. Ms. Cohen had begged them for disability accommodations for years. Defendants have ignored her, failing to accommodate her disability, for almost a decade.

259.   A "qualified individual with a disability" is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2).

260.   A person with a disability is "qualified" if "with or without ... the provision of services," he "meets the essential eligibility requirements for ... the participation in programs or activities provided by a public entity." Id. at § 12131(2); *Meadows v. Lind*, 996 F. 3d 1067, 1077 (10th Cir. 2021).

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 69 of
Case 3:23-cv-00073-SMR-WPK        Document 31-13      Filed 12/29/23      Page 69 of 93
**EXHIBIT M**

261.    Ms. Cohen is a "qualified individual with a disability" under ADA Title II because she has been and is in need of the services of the judicial division of the State of Colorado and its political subdivisions.

262.    Additionally, Ms. Cohen was a defendant in 14CR437. A defendant in a criminal case is a Title II "otherwise qualified individual" for purposes of accessing the course, and so is a lawyer. Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004).

263.    In 2014, instead of accommodating Ms. Cohen's disability as required by the ADA and the CRPC, counsel for the Office of Attorney Regulation, who has since resigned from that office, worked with the elected district attorney in Boulder County, who has also since resigned from that office, to file criminal charges against Ms. Cohen in Boulder District Court Case 14CR437. They both went to the same law firm after resigning from their State jobs.

264.    After committing dozens of Constitutional errors from the bench in that case and – in the words of the Colorado Court of Appeals – "confusing jurors to reach an incorrect verdict," Defendant Hartman ordered armed police officers to forcibly remove Ms. Cohen from a hospital bed, contrary to physicians' orders, to place her in extended solitary confinement, and to warehouse her for years in prison, where she languished without treatment for her disability while that case was pending on appeal.

265.    In 2019, the Colorado Court of Appeals unanimously reversed Defendant Hartman's convictions and illegal sentencing, but the damage to Ms. Cohen had already been done.  From 2019 to the present, the retrial of that case has involved a continuing

series of failures to accommodate Plaintiff's disability in violation of ADA Title II, as well as other continuing tortious conduct by Defendants against Plaintiff.

266.    The ADA's definition of discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

267.    The U.S. Court of Appeals for the Tenth circuit ruled that this Court is correctly "persuaded that we should hold that **the right of access to the courts requires the assistance of counsel** through completion of the complaint for a federal habeas or civil rights action." *See Nordgren v. Milliken*, 762 F.2d 851, 855 (10th Cir.) cert. denied, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

268.    In summary, the right of meaningful access to the courts "encompasses all the means a defendant might require to get a fair hearing from the judiciary on all charges brought against her or grievances alleged by her." *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

269.    Defendants are specifically charged under the terms of the United States Constitution and the Colorado Constitution with providing due process, the service of courts and judicial proceedings and other manifestations of that process such as courtrooms, clerk's offices and public meeting rooms that are conducted in the courthouses of the State of Colorado. Although the ADA does not define "services, programs, or activities," federal courts have adopted the definition to include "all of the operations of ... government." *Frame v. City of Arlington*, 132 S. Ct. 1561 (2012).

301. The ADA requires more than physical access to public entities: it requires public entities to provide "meaningful access" to their programs and services. *Robertson v. Las*

**EXHIBIT M**

*Animas County Sheriff's Dep't.*, 500 F.3d 1185, 1195 (10th Cir. 2007). The U.S. Supreme Court established the affirmative duty of states to protect meaningful access to the courts. *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977).

270.   To effectuate this mandate, "the regulations require public entities to `make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'" *Id*. (quoting 28 C.F.R. § 35.130(b)(7)); *Villa v. Dep't of Corrs.*, 664 Fed. App'x 731, 734 (10th Cir. 2016).

271.   A finding of a failure to accommodate requires a finding that the plaintiff was "denied the benefits" or otherwise discriminated against by the public entity. *Id*.

304. To state a failure to accommodate claim under ADA Title II, a plaintiff must show: (1) she   is   a   qualified   individual   with   a   disability; (2) she was "either excluded from participation in or denied the benefits of some public entity's   services,   programs,   or   activities;" (3) such exclusion or denial was by reason of her disability; and (4)   the   defendants   knew   she   was   disabled   and   required   an   accommodation. *See Ingram v. Clements*, 705 F. App'x 721, 725 (10th Cir. 2017) (quoting *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295, 1299 (10th Cir. 2016)); *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158.  To the extent any real or perceived gaps remain in the statutory text, the Supreme Court's Title II jurisprudence fills them. In

the Supreme Court recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion." Id. at 531, 124 S.Ct. 1978 (citing 42 U.S.C. § 12131(2)).

**EXHIBIT M**

272.   "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." J.V., 813 F.3d at 1295.

273.   Defendants have known since 2019 that Ms. Cohen was diagnosed with ADHD, and their own state-retained experts endorsed that diagnosis in 2018 and 2019. Defendants have received Ms. Cohen's most current ADHD diagnosis in the reports they provided to the state court finding her competent, not NGRI, and responding well to medical treatment.

274.   Defendants knew that Ms. Cohen needed replacement ADC as a reasonable accommodation for disability because Mr. Willett told them on the record in 2020 and 2021.  Mr. Willett told Defendant Hartman that Ms. Cohen had severe anxiety and depression. He told him that though Ms. Cohen was able to "assist counsel" with legal research and writing, she could not be tasked to represent herself during a trial as this would be overwhelming to her diagnosed PTSD. Defendant Hartman rolled his eyes as Mr. Willett said these things.  In 2023, Defendant Howard had the same reaction when Jeffery Weeden said these things.

275.   Defendant Hartman ruled that he would deny replacement counsel for the very same reasons that Mr. Willett said she needed counsel, because she is "so-called" disabled. He ruled on the record that "it doesn't matter."

276.   Sadly, Defendants Hartman and Howard refused to rely on the state court's own guidance. **The reasonable disability accommodations that Ms. Cohen requested are actually listed in Defendants' very own published "Guide to Providing Reasonable Accommodations for People with Disabilities for Judicial**

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 73 of
93
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 73 of 93
EXHIBIT M

**Officers, Probation and [sic] Court Staff."** *See* Colorado Judicial Department, *Access to the Courts: A Resource Guide to Providing Reasonable Accommodations for People with Disabilities for Judicial Officers, Probation and Court Staff*, COLORADO JUDICIAL BRANCH, Jun. 18, 2004 [March 22, 2022 3:02 PM], https://www.courts.state.co.us/userfiles/File/Administration/HR/ADA/ADAResourceGuide.pdf

277.   For the disability of ADHD, Defendants' own ADA guide states that "accommodations may include presenting information in a clear, concise, concrete and simple manner, providing a coach or support person at the proceeding, or allowing videotaped testimony or the use of video conferencing technology in lieu of a personal appearance." *Id.* **Ms. Cohen requested all of those things,** and Defendants denied her requests minutes later each time, never asking her any questions or for more information about what accommodations she needed or why.  Defendants Hartman and Howard screamed at her from the bench, "Stop," "Stop it," "Don't argue with the court."

278.   Under headings describing her documented disability (titled "What types of accommodations are available to assist people with cognitive or developmental disabilities?"), Defendants' own published "frequently asked questions" states that "[c]ognitive disabilities refer to any disability affecting mental processes. Examples include .. attention deficit hyperactivity disorder (ADHD).." *See* Colorado Judicial Department, *Requests for Accommodations by People with Disabilities Frequently Asked Questions,* COLORADO JUDICIAL BRANCH, March 9, 2012 [March 22, 2022 3:12 PM], https://www.courts.state.co.us/userfiles/file/ADA%20- %20FAQs%203-9-12.pdf.

**EXHIBIT M**

279.   The flowchart published at Defendants' "Requesting a Reasonable Accommodation" link has an in-text link to "Participant can follow grievance procedure," but clicking it opens a page titled "Page not found." *See Id.; See* Colorado Judicial Branch, *Page Not Found*, COLORADO JUDICIAL BRANCH, No Date of Publication [March 22, 2022                                            3:27                                            PM], https://www.courts.state.co.us/userfiles/File/Administration/HR/ADA/ADA_Grievance_Pr ocedur e.pdf

280.   Defendants' own guidance on ADHD has "suggested reasonable accommodations" including representation, the ability to submit written pleadings electronically after representation was denied, and web appearances at hearings not involving a jury (as is also authorized for any [party, regardless of disability, without any request for accommodation by Colorado Rule of Criminal Procedure 43 for any party in any proceeding not involving a jury). *See* Colorado Judicial Department, *Requesting a Reasonable Accommodation – Non-Employee*, COLORADO JUDICIAL BRANCH, No Date of Publication [March 22, 2022 3:15 PM], https://www.courts.state.co.us/userfiles/File/Administration/HR/ADA/ADA- Requesting_a_Reasonable_Accommodation-Flow_Chart_Non-Employee.pdf; *Colo. R. Crim. P. 43 "Presence of Defendant," (e) Presence of the Defendant by Interactive Audiovisual Device.*

281.   Ms. Cohen requested all of these from Defendants, from the state court, from the named ADA Coordinator, and from every other source available to her at every opportunity she had in the state court proceedings. Her claims and requests for accommodations were all denied in the state court proceedings. Defendants summarily

denied every accommodation every time, explaining on the record that its denials were due to her having "claimed" she has a "so-called" disability.

282.   **In November 2023, Defendant Howard acted outside the scope of his judicial function, and therefore outside the scope of his judicial immunity, subjecting him to individual liability, when he took over the role of ADA Coordinator.**   The record and the emails between him, Ms. Cohen, and the "ADA Coordinator"-in-name Mallory Hochwender, show that it was Judge Howard who was making the decisions on whether or not to accommodate Ms. Cohen's disability. **Discovery will show whether Defendant Hartman was also acting in the role of ADA Coordinator, and if he was, he will also have no judicial immunity for the denials of accommodations.**

283.   When Mr. Willett asked Defendant Hartman to appoint replacement ADC counsel as an accommodation for disability in 2021, Defendant Kelly objected and Defendant Hartman told Mr. Willett that the state courts are not the proper place to bring ADA claims. Defendant Hartman told Mr. Willett and Ms. Cohen that the federal courts are the proper place to file an ADA complaint.  From 2022 to 2023, Defendants Dougherty and Kendall have continued to make similar arguments as her successor.

284.   Colorado state law required Defendant Hartman to conduct an inquiry and appoint replacement counsel at any rate, since Mr. Willett was appointed ADC withdrawing due to a conflict that was not attributable to Ms. Cohen, but rather was due to an immediate family relationship of his with a prosecution witness. *See People ex rel. Gallagher*, 933 P.2d at 588-89.

**EXHIBIT M**

285.   When Defendant Hartman refused to appoint replacement counsel even as an accommodation for disability, saying he wanted to end the retrial proceedings quickly and he didn't think anyone could accommodate Ms. Cohen's "so-called" disability, he denied Ms. Cohen the same access to retrial that any other non-disabled indigent defendant would have had with replacement ADC.

286.   To recover compensatory damages under Title II of the ADA, courts generally require a showing of intentional discrimination. *See Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir. 1999). Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id.*

287.   The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that . . . likelihood." *See Barber ex rel. Barber v. Colo. Dep't of Rev.,* 562 F.3d 1222, 1229 (10th Cir. 2009). The failure to act must be "more than negligent" and involve "an element of deliberateness." *Id.* at 1228.

288.   Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id.*at 296 (holding that "federal agencies and "intentional discrimination" is a term of art requiring something more than an incidental discrimination or evidence defendant treated plaintiff

76

**EXHIBIT M**

badly because of his disability. The U.S. Supreme Court has instructed that the ADA was adopted not only to curb "conduct fueled by discriminatory animus," but also to right "the result of apathetic attitudes rather than affirmative animus." *Alexander v. Choate*, 469 U.S. 287, 296, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), also stating "commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.").

289.   The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) knowledge that a harm to a federally protected right is substantially likely, . . . and (2) a failure to act upon that . . . likelihood." *Revenue,* 562 F.3d 1222, 1229 (10th Cir. 2009).

290.   Ms. Cohen can establish "intentional discrimination" in this case by presenting evidence that (1) Defendants' "conduct was fueled by discriminatory animus," *See Powers*, 184 F.3d at 1152-53 (quoting, 469 U.S. at 296); or that (2) Defendants acted with "deliberate indifference to the strong likelihood that pursuit of its questioned actions would likely result in a violation of federally protected rights." *Id*.

291.   Jurors will also see evidence of Defendants' intent to physically harm Ms. Cohen, or at the very least to act toward her in a way that was deliberately indifferent to the harm it caused her. *See Barber ex rel. Barber v. Colo. Dep't of Rev.*, 562 F.3d 1222, 1229 (10th Cir. 2009).

292.   Defendants cannot credibly claim "unintentional oversight," because they were armed with detailed knowledge of and access to medical reports of the symptoms and vulnerabilities of Ms. Cohen's specific disability, informing them exactly how their Title II violations toward her would make those symptoms even worse.

**EXHIBIT M**

326. When Defendants used their official capacities to deny Ms. Cohen the right to counsel, they knew or should have known that she would lose her ability to access the courts.

293.    The right to counsel is guaranteed to every defendant charged with a felony in state court, as Ms. Cohen was after she disclosed her disability and voluntarily closed her law practice. *See Gideon v. Wainwright*, 372 U.S. 335 (1963).

294.    While every defendant is guaranteed the right to counsel, the facts in this Complaint and the evidence at trial will show that at the time they acted, these Defendants knew or should have known that the Colorado Supreme Court – the highest court in the state – to which their official actions are unequivocally subject, had already ruled that Ms. Cohen's disability made representation by counsel not just a right in criminal proceedings, but also an absolute need.

295.    Prior to Defendants' conduct in this case, Defendants knew or should have known that the Colorado Supreme Court had already ruled that Ms. Cohen is disabled, and that as a result of her disability she was unable to represent herself in court without accommodations.  Even so, from 2014 to 2023, Defendants have all worked together to force her to represent herself in a criminal courtroom, depriving her of the right to conflict-free counsel, the right to confrontation, the privilege against self-incrimination, the right to petition the court for redress of grievances, and other Constitutional rights.

296.    When, prior to the appellate reversal, the Colorado Supreme Court decided to hear the disbarment proceedings that Defendant Kelly's office urged it to hear (by mailing it repeated requests to please disbar Ms. Cohen in 2015 before the Court of Appeals could rule), the Colorado Supreme Court first ruled that the symptoms of Ms.

**EXHIBIT M**

Cohen's disability required her to be represented by an attorney in any Colorado Supreme
Court proceedings.

297.   The disbarment proceedings initiated by Defendant Kelly's office were
based entirely on a conviction that no longer exists. The state's pleadings in those
proceedings concede that in the event of an appellate reversal, which occurred, Ms.
Cohen's law license is eligible for summary reinstatement.

298.   Defendants are licensed Colorado attorneys. They knew that disbarment
proceedings are quasi-criminal in nature. They knew that the right to counsel is even more
urgent as a structural Constitutional right in purely criminal cases, such as the cases they
were acting to advance against Ms. Cohen, and they knew and know why that is. They
knew their denial of her right to counsel caused a "strong likelihood" that "would likely
result in a violation of federally protected rights."

299.   On November 2, 2021, specifically, Defendants used their official capacities
to take actions and to order their subordinate officials to take actions to illegally arrest and
detain Ms. Cohen in solitary confinement, where she was held without prescribed
medications for more than five weeks.

300.   Their actions were ostensibly based on an alleged "failure to appear" at a
hearing at which Ms. Cohen had in fact already appeared, and at which Defendant Kelly
and Ms. Cohen had already argued the last of their pretrial motions on which Defendant
Hartman had already ruled.

301.   Defendants knew on that day that as a result of their actions Ms. Cohen
would lose even more than the right to counsel they had already taken from her.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 80 of
Case 3:23-cv-00073-SMR-WPK      Document 31-13      Filed 12/29/23      Page 80 of 93
**EXHIBIT M**

302.    Defendants knew that by ordering Ms. Cohen to be wrongfully arrested and detained, having already been denied her right to counsel, keeping her locked up would cause her to also lose the *pro se* court access they had earlier forced upon her by ignoring the Colorado Supreme Court's order and its underlying evidence of Ms. Cohen's disability when they acted to deny her right to counsel.  They knew it when they did it in 2015.  They knew it when they did it in 2021.  They knew it when they did it in 2023.

303.    In 2021, Defendants knew Ms. Cohen had previously asked this Court for an injunction to stop their increasingly violent denials of her Constitutional rights.  Instead of following their legal obligations and ethical duties to engage with those proceedings in this Court, Defendants abused their positions of power as officers of the state courts to order the police to lock Ms. Cohen away from access to PACER and access to this Court.  Now, in 2023, they're about to do it again.

304.    Defendants also knew that by forcibly and impermissibly taking from Ms. Cohen her right to counsel and then her right to access this Court, they were also taking from her the right to access and attempt to defend herself in the ostensible criminal case retrial in the state courts (in which the statutory speedy trial period had long since already run, divesting Defendants of jurisdiction to act at all in the first place).

305.    Perhaps most cruelly, when Defendants denied Ms. Cohen's rights to access the courts by ordering her to be jailed on the basis of a baseless warrant, they knew that the records of her disability, long since in their possession, warned that being held in jail would exacerbate the symptoms of her disability due to jail conditions and due to the jail's known policy-based refusal to give Ms. Cohen her prescribed "non-formulary"

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 81 of
Case 3:23-cv-00073-SMR-WPK      Document 31-13      Filed 12/29/23      Page 81 of 93

EXHIBIT M

medications. They knew their actions would make her sicker. This is just one of example of their deliberate indifference and intentional discrimination.

306.   Defendants had Ms. Cohen held in solitary confinement in jail on what they communicated to the holding facility to be a "no bond" hold for five weeks.

307.   Ms. Cohen did not receive the prescribed medications for her disability for five weeks due to Defendants' actions and orders.

308.   Defendants knew that being held in jail without medications, and without any other disability accommodations, would make her disability worse, and it did.

309.   Defendants were parties to Ms. Cohen's 2021 petition to enjoin them, and they and their successors have been parties to her 2023 petitions to join them, too. They know the procedural postures of the ADA cases she has filed. They knew that by denying Ms. Cohen access to continue that case, they would win an administrative dismissal of the 2021 federal case, and they are trying to do that here now in 2023.

310.   Defendants also knew that a coerced plea would end their criminal retrial prosecution of Ms. Cohen – ostensibly anyway, because they also knew that the state district court had already lost jurisdiction because, as they admit on the record in that case, the statutory speedy trial period had long since expired.

311.   Defendants did what they did to Ms. Cohen with knowledge that doing so would deny her access to the courts and further disable her, or without regard to whether it would.

312.   For these and further reasons that are detailed in this Complaint and will be argued to jurors, Ms. Cohen may and now does seek monetary and other damages from Defendants, in their official capacities, pursuant to Title II of the ADA.

**EXHIBIT M**

313.   The exclusion, denial of benefits, or discrimination by Defendants against Ms. Cohen was by reason of her disability.   Mr. Willett filed a motion and made an argument during the hearing, both of which alleged that Defendants were violating ADA Title II by refusing to appoint substitute counsel, since a conflict had arisen for him. Defendant Hartman declined to rule on whether the court was failing to accommodate, whether it was discriminating, whether it was retaliating, and whether it was violating the ADA in any way in its handling of Ms. Cohen's case. When considering similar conduct from other state defendants in ADA Title II suits, this Court has found that "**failure to act is a result of conduct that is more than negligent and involves deliberateness**." Dorsey v. Pueblo School Dist., 140 F. Supp. 3d 1102 (Dist. Court, D. Colorado 2015).

314.   ADA Title II also applies to arrests, including the requirement to provide reasonable modifications. Moreover, the first element of the deliberate indifference analysis—knowledge that a harm to a federally protected right is substantially likely— does not require a prior judicial finding that the challenged actions violate the law. When Defendants had Ms. Cohen arrested, they also did not accommodate her disability. On the contrary, they took all of her medications and other accommodations away from her, including her access to a lawyer, despite her repeated requests for a lawyer while she was held in jail in 2014 and in 2021, both at the orders of Defendants.

315.   Defendants have an active practice of discrimination, a repeated practice of summarily denying accommodations for disability without so much as an inquiry, and an active pattern of deliberate indifference. In Defendants' own words, on the record: disability "doesn't matter;" "stop talking" because "we really don't care."

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 83 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 83 of 93
**EXHIBIT M**

316.   **CLAIM TWO: ADA TITLE II – DISABILITY DISCRIMINATION.**   Title II of
the ADA prohibits discrimination on the basis of disability in the provision of services,
programs, and activities by state and local government entities, which include an office of
a state district attorney and its official capacity actions. *Id*.

317.   A plaintiff need not establish discriminatory intent to show that an action
was taken "on the basis of disability, because `any failure to provide reasonable
accommodations for a disability is necessarily because of disability.'" *Lincoln v. BNSF Ry.
Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (quoting *Punt*, 862 F.3d at 1048).

318.   In *Lane*, two plaintiffs brought an action against the state of Tennessee
alleging violations of ADA Title II because they were unable to access state courts. *Lane*,
541 U.S. at 510. When Mr. Lane attempted to access the court after being denied a
reasonable accommodation, he said "the judge and other courthouse employees stood
at the top of the stairs and laughed at me."1 Mr. Lane's case was not heard in the morning
session, and at the lunch break he had to crawl back down the stairs. That afternoon,
when he was physically unable to crawl up the stairs again, he was arrested for "failing to
appear," and put in jail. *Id.*

319.   In fact, after Defendant Hartman told his clerk that he had Ms. Cohen
arrested, his clerk wrote an email to another clerk saying, **"I just heard about Cohen
and all I can say is LOL."**

---

1 Can Disabled People Be Forced to Crawl Up the Courthouse Steps?" (Published
2004) Website title: Nytimes.com URL:
https://www.nytimes.com/2004/01/11/opinion/editorial-observer-can-disabled- people-
be-forced-crawl-up-courthouse-steps.html

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 84 of 93
Case 3:23-cv-00073-SMR-WPK      Document 31-13      Filed 12/29/23      Page 84 of 93

**EXHIBIT M**

320.   On the record, Defendant Hartman referred to treatment for Plaintiff's disability as "irrelevant and embarrassing," saying it's "not important" and "doesn't matter." He sent armed police officers to forcibly remove her from medical treatment after refusing disability accommodations.  He refused on the record to review her medical records before the illegal sentencing, and then ordered her to be illegally imprisoned for years. To secure federal funding, he made sure to check the box for "court-ordered mental health treatment" in his sentencing order, but when Ms. Cohen's family emailed him reporting the State of Colorado had denied her medication, he replied that Plaintiff's family should not contact Defendants again.

321.   When the State of Colorado decided to prosecute Ms. Cohen criminally in 2014, Boulder municipal judges, court clerks, and assistant district attorneys who were not even involved with the prosecution informed Defendants that Ms. Cohen had a history of disability that required accommodation to access the courts.

322.   Like the defendant judge in *Lane*, however, Defendant Hartman ordered Ms. Cohen to be arrested for "failing to appear." Defendant Hartman did this twice, and both times that he ordered her to be arrested for "failing to appear," she had in fact appeared via WebEx as he had authorized her to do.

323.   Forcing Ms. Cohen to pay for her accommodations has also been illegal. ADA Title II regulations forbid the public entity from passing on the costs of accommodations to disabled individuals. 28 C.F.R. § 33.130(f).

324.   Defendants' refusal to accommodate Ms. Cohen's disability was a pattern and practice of a common custom of the Defendants.

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 85 of
Case 3:23-cv-00073-SMR-WPK     Document 31-13     Filed 12/29/23     Page 85 of 93
**EXHIBIT M**

325.   Those customs, patterns, and practices include but are not limited to mocking disabled individuals for their disabilities, making it difficult for individuals to access or obtain their medications, speaking openly about those medications in front of others, denying counsel to disabled individuals, denying document filing to disabled court participants, denying online document access to disabled individuals, and retaliating against disabled judicial system participants for behaviors that are known to be products of their disabilities.

326.   Holding Ms. Cohen in solitary confinement for five weeks in 2021 without medication to coerce her to sign a plea agreement also was discrimination based on disability. The Supreme Court in *Olmstead* explicitly held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597. The Court noted that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Id.* at 600.

327.   **CLAIM THREE: ADA TITLE II – RETALIATION.**  Defendants also violated Ms. Cohen's rights under Title II of the ADA by retaliating against her on the basis of her disability.

328.   Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. § 12131, and its implementing regulation 28 C.F.R. Part 35, all prohibit discrimination on the basis of disability by public entities.  **The Title II regulation at 28 C.F.R § 35.134 contains the retaliation prohibition.**

329.   A prima facie case of retaliation is established by showing:

Case No. 1:22-cv-00773-WJM-SKC    Document 69    filed 11/19/23    USDC Colorado    pg 86 of
Case 3:23-cv-00073-SMR-WPK    Document 31-13    Filed 12/29/23    Page 86 of 93
**EXHIBIT M**

(1) an individual engaged in a protected activity, such as participating as a witness in a protected activity or filing a complaint;

(2) the recipient was aware of, or had knowledge of, the protected activity;

(3) the recipient took adverse action against the individual contemporaneously with or subsequent to the individual's participation in the protected activity; and

(4) there was an inferable causal relationship between the adverse action and the individual's participation in the protected activity.

"Direct evidence of retaliation is evidence that demonstrates a specific link

between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct." *Young-Losee*, 631 F.3d at 912.


330.    Retaliatory action is defined broadly. "The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996).

331.    On the record, Defendant Hartman openly discriminates against Ms. Cohen on the basis of disability, creating its own presumptions (ruling "presumably..," without citing any source beyond itself). The record shows he went as far as ruling, without reviewing medical records, without hearing any testimony, and without any medical expertise of its own, that Ms. Cohen's deficit disorder is "voluntary," that she "created" it, and that she had "caused herself to have a medical condition."

332.    Defendant Hartman has relished every opportunity to very publicly mock Ms. Cohen for having requested disability accommodations.  He admitted on the record

Case No. 1:22-cv-00773-WJM-SKC   Document 69   filed 11/19/23   USDC Colorado   pg 87 of
Case 3:23-cv-00073-SMR-WPK   Document 31-13   Filed 12/29/23   Page 87 of 93

**EXHIBIT M**

in the state court proceedings that he was retaliating against her in his official capacity by imposing an illegal duplicative sentence based on her having sought ADA accommodations.  In 2015, when she was in the hospital, he told jurors and press that he would sentence her more harshly because she was in the hospital, and then he did.  In 2021, he issued yet another warrant to arrest her and wrote in it that she had previously sought medical treatment she didn't need.  In 2023, he told his romantic partner, who is also the detective in the case, that he issued the warrant in 2021 because he didn't believe that she needed medical care in 2014, 2021, or 2023; these are all his own opinions, as the evidence from medical doctors all said the opposite was true.  These things are the very definition of Title II retaliation, and it are just a few of many examples of how Defendants have retaliated against Ms. Cohen on the basis of disability.

333.    Again: on November 2, 2021, Defendants and Ms. Cohen appeared for a motions hearing in the Boulder District Court. Ms. Cohen, who lives in Iowa, had been authorized by the Boulder court on several occasions to appear via WebEx, even prior to the pandemic, which she did.  An hour prior to the hearing, the court's clerk emailed Ms. Cohen to confirm that yes, she had indeed been authorized by the judge to appear via WebEx.  These authorizations all occurred **before** Ms. Cohen had sent documentation from her doctor's office to Defendants confirming she had tested positive for Covid, as Defendant Hartman had illegally ordered her to do.

334.    Again:  Ms. Cohen had appeared by WebEx in the retrial as authorized for nearly every hearing in the retrial case, including for previous motions hearings and trial readiness hearings.

**EXHIBIT M**

335.    The ostensible purpose of the hearing that day was for the parties to argue their pretrial motions, hearing the judge's rulings on the motions, and then announce ready for the retrial, all of which took place, as the record of that hearing shows.  Prior to that hearing, several attorneys had communicated with Defendants about the nature of Ms. Cohen's disability and had shared with them their concern that the statutory speedy trial period had already run in the retrial, divesting Defendants of jurisdiction to continue prosecuting Ms. Cohen, and advising Defendants to appoint alternate defense counsel to represent her.  Defendants were also aware of their own Colorado Supreme Court's finding that Plaintiff was able to assist counsel in closing her law firm, and its ruling that, due to her disability, she must have counsel represent her in those proceedings, which she did.

336.    As recently as 2021, Mr. Willett, who was prior appointed ADC counsel for Ms. Cohen, who was forced to withdraw due to his own personal conflict, implored the court to appoint alternate defense counsel as a matter of course as required by Colorado state law. When Defendant Kelly objected to this and Defendant Hartman denied it, Mr. Willett also moved for counsel to be appointed as an accommodation for disability. Defendants also objected to and denied that.  The same process has taken place in 2023, with Jeffery Weeden saying the same thing and Defendant Howard replying with the same denial and retaliation.

337. During the hearing on November 2, 2021, Defendants had actual knowledge of Ms. Cohen's decades-documented neurocognitive impairments, including ADHD, PTSD, and significant impairments related to processing auditory verbal information, executive function, memory, mood, organization, and impulse.

**EXHIBIT M**

338.   During the hearing on November 2, 2021, Defendants had actual knowledge of its own Colorado Supreme Court's finding and order that Ms. Cohen must have defense counsel in quasi-criminal proceedings to close her law firm, due to her disability.

339.   During the hearing on November 2, 2021, Defendants were aware that its proceedings against Ms. Cohen on that day were a state felony criminal prosecution, and that the level of Constitutional scrutiny and the potentials for deprivation were far more serious than PDJ proceedings.

340.   During the hearing on November 2, 2021, Defendants were aware that Ms. Cohen had requested appointed counsel and other accommodations repeatedly, in the event the court refused to hear her renewed argument that the statutory speedy trial period had run.

341.   Defendants summarily refused to hear any speedy trial expiration evidence, refused to appoint counsel, refused all other accommodations, and instead conspired to procure a fraudulent to arrest Ms. Cohen.

342.   In retaliation for being disabled and for needing accommodations, with knowledge that the statutory speedy trial period had divested its court of jurisdiction, Defendants locked Ms. Cohen in solitary confinement for the next six weeks without prescribed medications and without disability accommodations, on a "No Bond" hold.

343.   During this time, Defendants tortured Ms. Cohen and forced her through coercion, duress, and threats of continued solitary confinement to sign various documents without a lawyer, including releases of her protected health information, documentation of her disability which it continued to exploit instead of accommodating, and plea

**EXHIBIT M**

paperwork purporting to admit guilt in the retrial long after the statutory speedy trial period had expired, all without counsel.

344. On the day of Ms. Cohen's arrest on November 2, 2021, Defendants not only failed to provide Ms. Cohen with any reasonable accommodations, but affirmatively chose to deprive her of each and every possible accommodation that they knew she relied on to compensate for her specific cognitive deficits.

345. Defendants instructed local jail officials via email to present Ms. Cohen with false accusations they knew she would have difficulty processing due to her documented PTSD, ADHD, dyslexia, anxiety, and depression diagnoses.

346. Defendants demanded Ms. Cohen produce multiple versions of the same evidence of letters from her doctors, while at the same time arresting and cutting her off from anyone who could help her process what she had been told, including her treating physician, who was scheduled to meet with Ms. Cohen that very day but was not allowed by the jail to see her.

347. Defendants' retaliation served to exacerbate the conditions that Ms. Cohen suffered. This exacerbation has led to increased harms that persons within the community without disabilities likely have never felt. It has caused immeasurable harm.

**E. REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

**EXHIBIT M**

WHEREFORE, Ms. Cohen respectfully requests judgment from this Court for:

Compensatory damages, including damages for pain and suffering, with interest;

In the event counsel is retained for trial, their attorney fees and costs; and

Other relief the Court determines proper in this case.

**JURY DEMAND**: Plaintiff respectfully demands a trial by jury in this matter.

### F.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this

complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. §

1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of

my knowledge, information, and belief that this complaint: (1) is not being presented for

an improper purpose, such as to harass, cause unnecessary delay, or needlessly

increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous

argument for extending or modifying existing law; (3) the factual contentions have

evidentiary support or, if specifically so identified, will likely have evidentiary support after

a reasonable opportunity for further investigation or discovery; and (4) the complaint

otherwise complies with the requirements of Rule 11.

**EXHIBIT M**

s/ Emily Cohen

_____

(Plaintiff's signature)

November 19, 2023

_____

(Date)

## CERTIFICATE OF SERVICE

I certify that on November 19, 2023, I filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing, along with the copy sent via U.S. Mail, to all parties using the following e-mail addresses:

David Evan Hughes dhughes@bouldercounty.org, cpeterson@bouldercounty.org, jcoil@bouldercounty.org, kgoodnight@bouldercounty.org, nleadens@bouldercounty.org, rnelson@bouldercounty.org, sadamson@bouldercounty.org

Jack Davy Patten, III jack.patten@coag.gov, Ashley.minnick@coag.gov, LaTasha.Carter@coag.gov, zoe.johnson@coag.gov

Colin James Mayberry cmayberry@bouldercounty.org, cpeterson@bouldercounty.org, jcoil@bouldercounty.org, kgoodnight@bouldercounty.org, nleadens@bouldercounty.org, rnelson@bouldercounty.org, sadamson@bouldercounty.org

Lauren Eileen Davison lauren.davison@coag.gov, Denise.munger@coag.gov, latasha.carter@coag.gov

s/ Emily Cohen
Emily Cohen

**EXHIBIT M**